# EXHIBIT 4

**Before**

**J.C. GONZALEZ**

**Impartial Arbitrator**

| | |
|---|---|
| In the Matter of an Arbitration Between: | ) |
| UNITE HERE Local 11, | ) |
| Union, | ) |
| and | ) |
| HYATT HOTELS CORPORATION, | ) |
| Employer, | ) |
| Thompson Hollywood & Tommie Hollywood Hotels. | ) |

**UNION'S POST-HEARING BRIEF**

JOSHUA F. YOUNG
NICOLE GRINSTEIN
GILBERT & SACKMAN
A Law Corporation
3699 Wilshire Boulevard, Suite 1200
Los Angeles, California 90010
(323) 938-3000

*Attorneys for UNITE HERE Local 11*

**TABLE OF CONTENTS**


I. INTRODUCTION .......... 1

II. ISSUES SUBMITTED .......... 7

III. RELEVANT CONTRACT PROVISIONS .......... 8

IV. STATEMENT OF FACTS .......... 8

A. Background .......... 8

B. Relevant Granted Hyatt the Right to Manage the tommie and the Thompson in Two Parallel Hotel Management Agreements .......... 8

C. After Three Months of Negotiation, on April 5, 2019, Local 11 and Hyatt Entered into an MOA Which Contained Card Check/Neutrality Provisions and a Successorship Clause Governing the tommie and the Thompson .......... 10

D. When Relevant Realized that the MOA Would Hurt Financing Efforts, Hyatt and Relevant Conspired to Extinguish the Union's Rights in the tommie and Thompson by Rearranging their Business Plans at the Hotels .......... 12

E. Two Days Before the Opening of the Thompson, on August 6, 2021, Hyatt and Relevant Terminated the HMAs and Entered into Franchise Agreements for the tommie and the Thompson .......... 14

F. The Termination and Franchise Agreements Granted Relevant the Right to Manage the tommie and the Thompson, but Omitted Relevant's Obligation to Assume the MOA .......... 16

G. When Relevant Refused to Abide by the MOA, Local 11 Promptly Initiated Arbitration Against Hyatt .......... 17

H. Hyatt Maintains a Close Business Relationship with Relevant at the tommie and the Thompson in Hyatt's Capacity as Franchisor .......... 18

V. ARGUMENT .......... 18

A. By the Plain Language of the MOA, Hyatt Breached its Contractual Obligations to Local 11 When it Transferred its Right to Manage the tommie and the Thompson to Relevant without Requiring Relevant, its Successor, to Assume the MOA .......... 18

1. Principles of Interpretation .......... 18

2. The Right to Manage the tommie and the Thompson is a "Right" Subject to the Successor Clause of the MOA .......... 19

3. Hyatt Unquestionably Transferred its Right to Manage the tommie and the Thompson to Relevant .......... 23

**TABLE OF CONTENTS**
**(Continued)**


4. Relevant is Hyatt's Successor in Interest Because the Termination and Franchise Agreements Transferred the Right to Manage the tommie and the Thompson to Relevant ........ 29

B. Hyatt's Efforts to Obtain an Assumption of the MOA from Relevant during the Negotiation of the HMA Amendments Do Not Excuse Hyatt from Liability ........ 37

C. Because Hyatt has Proffered Shifting Justifications as to Why it Did Not Attempt to Obtain an Assumption of the MOA from Relevant during the Negotiation of the Termination and Franchise Agreements, the Arbitrator Should Disregard Any Argument that the Plain Language Shields Hyatt from Liability ........ 37

D. Failure to Find a Breach of Hyatt's Successorship Obligations Would Encourage Employers and Developers in Los Angeles to Engage in Evasive Anti-Union Tactics of the Nature Here ........ 39

VI. REMEDY ........ 40

A. The Arbitrator Should Order Hyatt to Obtain an Assumption of the MOA from Relevant Because Paragraph 13 of the MOA Expressly Authorizes the Arbitrator to Order the Non-compliant Party to Comply with the MOA ........ 40

B. Hyatt and Relevant's Ongoing Franchise Relationship at the tommie and Thompson Hotels Negates Any Argument that Specific Performance is Impossible ........ 41

C. Any Balancing of Equities Favors Local 11 ........ 44

1. The Standard for Specific Performance ........ 44

2. The Arbitrator Should Award Specific Performance Because Hyatt Covertly Participated in Relevant's Collusive Effort Yet Reaped Financial Benefit from It ........ 45

3. The Arbitrator Should Award Specific Performance Because Monetary Damages Are an Inadequate Substitute for an Employer's Promise to Protect Organizing Rights ........ 46

4. Hyatt Acted in Bad Faith when it Neglected to Withhold Franchise Rights or Use Other Sources of Leverage to Compel Relevant to Assume the MOA during the Negotiation of the Termination and Franchise Agreements ........ 48

5. The Union Acted Logically by Signing the MOA with the Employer Instead of the Developer Following Three Months of Good Faith Negotiations ........ 51

i. Hyatt Has Not Shown that the Union Possessed or Used CEQA Litigation to which the Union is not a Party as Leverage ........ 51

**TABLE OF CONTENTS**
**(Continued)**


ii. Because Executing an MOA Directly with an Employer is the Best Way to Protect the Union's Interests, it Would Have Been Foolish for the Union to Execute an Owner's Letter with Relevant ... 53

iii. Even if an Owner's Letter Would Have Obviated the Need for Hyatt to Obtain an Assumption of the MOA from Relevant, Unlike Hyatt, the Union Was Not Obligated to Protect Hyatt's Interests ... 53

iv. Hyatt, Relevant, and the Union Acted in Concert to Achieve the MOA, Belying Hyatt's Claim that the Union was "Wheeling and Dealing Behind Hyatt's Back" ... 54

6. Hyatt will Suffer No Harm from an Order of Specific Performance Because Relevant is Legally Obligated to Indemnify Hyatt for Costs Associated with this Arbitration and the Hotels are Now Profitable ... 55

7. The Union Did Not Delay in Bringing this Arbitration Against Hyatt ... 56

D. California Civil Code Section 3390, Subdivision (d) Is Inapplicable ... 57

1. Because Paragraph 13 Prohibits the Arbitrator from Adding to, Subtracting from, or Otherwise Modifying the MOA, and the MOA is Silent as to the Incorporation of State Law, the Arbitrator's Application of State Law Would Exceed His Authority ... 57

2. Even if the Arbitrator's Authority was Limited by State Law, Local 11 Has Found no Court Precedent or Arbitral Caselaw Which Supports the Application of Section 3390(d) to this Case ... 60

3. Relevant is Not a Third Party to the Contract in Any Usual Sense ... 61

E. Alternatively, the Arbitrator Should Award Local 11 Monetary Damages ... 62

VII. CONCLUSION ... 62

# TABLE OF AUTHORITIES

**STATUTES**

Cal. Civil Code 3390(d) ........................................ passim

**COURT DECISIONS**

*George Day Const. Co. v. United Bhd. of Carpenters & Joiners of Am., Loc. 354*,
722 F.2d 1471 (9th Cir. 1984) ........................................ 58

*Howard Johnson Co. v. Detroit Loc. Joint Exec. Bd., Hotel & Rest. Emp. & Bartenders Int'l Union, AFL-CIO*,
417 U.S. 249 (1974) ........................................ 36

*Northrop Corp. v. Triad Int'l Mktg. S.A.*,
811 F.2d 1265, 1269–70 (9th Cir. 1987), *amended*, 842 F.2d 1154 (9th Cir. 1988) ........ 60

*United Steelworkers of Am. v. Enter. Wheel & Car Corp.*,
363 U.S. 593 (1960) ........................................ 57

*Wheelabrator Envirotech Operating Servs. Inc. v. Massachusetts Laborers Dist. Council Loc. 1144*,
88 F.3d 40 (1st Cir. 1996) ........................................ 4, 30, 37

**ARBITRATION DECISIONS**

*201097-AAA*,
2017 LA Supp. 201097 (Bodah, 2017) ........................................ 7, 57, 60

*City of Canton*,
131 LA 51 (Szuter, 2012) ........................................ 19

*Dunlop Tire Corp.*,
94 LA 365 (Kindig, 1990) ........................................ 58

*Glasgow School District No. 11A*,
92 LA 287 (Corbett, 1988) ........................................ 58

*Grower-Shipper Vegetable Assn.*,
70 LA 350 (Ross, 1978) ........................................ 57

*High Point Sprinkler Co.*,
67 LA 239 (Connolly, 1976) ........................................ 36

*Kobelco Stewart Boiling Co.*,
1997 LA Supp. 103580 (Talarico, 1997) ........................................ 41

*Marley-Wylain Co.*,
88 LA 978, 983 (Jacobowski, 1987) ........................................ 4, 25, 40

**TABLE OF AUTHORITIES**
**(Continued)**

*Martin Podany Associates*,
80 LA at 658, 663 (Gallagher, 1983) .......... 25, 36

*San Jose Unified School District*,
1995 LA Supp. 114304 (Bogue, 1995) .......... 58

Sexton's Steak House, Inc.
76 LA 576 (Ross, 1981) .......... 32, 36, 47

*Summit Associates, Inc.*,
1997 LA Supp. 101889 (Fullmer, 1997) .......... passim

*Transamerica Delaval, Inc.*,
85 LA 321 (Bridgewater, 1985) .......... 7, 41, 59

**NLRB CASES**

*Fall River Dyeing & Finishing Corp. v. N.L.R.B.*,
482 U.S. 27 (1987) .......... 37

*NLRB v. Burns International Security Service*,
406 U.S. 272 (1972 ) .......... 33

**TREATISES**

25 Williston on Contracts (4th ed.) .......... 56, 60

Black's Law Dictionary (11th ed. 2019) .......... passim

Elkouri & Elkouri, How Arbitration Works (Kenneth May et al. eds., 8th ed. 2016) .......... passim

Marvin F. Hill & Anthony V. Sinicropi,
*Remedies in Arbitration* (2d. ed. 1991) .......... 40

**OTHER AUTHORITIES**

Dictionary.com .......... 22, 23, 24, 34

Merriam-Webster.com .......... 34

## I. INTRODUCTION

In late 2018 and early 2019, UNITE HERE Local 11 ("Local 11" or "the Union") negotiated a card check/neutrality agreement with Hyatt Hotels Corporation ("Hyatt" or "the Employer") and developer Relevant Group ("Relevant"). The nascent deal concerned two hotels then under construction – the Thompson Hollywood ("the Thompson") and the tommie Hollywood ("the tommie") (collectively, "the Hotels") – which Relevant owned and in which Hyatt possessed exclusive management rights pursuant to two Hotel Management Agreements ("HMAs"). *See* JXs 2 & 3.

On April 5, 2019, the Union and Hyatt memorialized the agreed-upon terms in a Memorandum of Agreement ("the MOA" or "the Agreement"). JX 1. The MOA contains card check/neutrality provisions which ensure the "orderly environment for the exercise by the Employer's Employee of their rights under Section 7 of the National Labor Relations Act" as well as a successorship clause which imposes on Hyatt an active duty to obtain an assumption of the MOA from the Hotels' subsequent operator. JX 1, ¶¶ 5-15.

Yet behind closed doors months later, Relevant expressed deep discontent over the MOA to Hyatt alone. Relevant chiefly alleged that the Union agreement was hurting Relevant's efforts to obtain additional financing for the Hotels. Relevant also incredulously claimed that Hyatt breached the HMAs by signing the MOA, even though it was Relevant's principal and co-founder, Richard Heyman, who instructed Hyatt to enter the MOA and greenlighted its terms. Their dispute initiated a months-long process of covert renegotiations over the Hotel management structure: first, Hyatt and Relevant sought to amend the HMAs. When that failed, Relevant proposed swapping their management deal for a franchise deal specifically designed to evade the MOA.

Concerned only with protecting its own financial and brand interests, and in overt disrespect to the MOA, Hyatt revealed none of this to the Union, and instead acquiesced in Relevant's plan.

Just two days before the August 6th, 2021, opening of the Thompson, Hyatt and Relevant indeed executed two Termination of Hotel Management Agreements ("the Termination Agreements") and two Franchise Agreements ("the Franchise Agreements"). JXs 35 & 36. Within them, Relevant assumed Hyatt's previous position as manager of the tommie and the Thompson while Hyatt embraced its new position as franchisor. *See* JXs 35-38. The deal involved the very same parties and the very same hotels as did the prior HMAs, just with Hyatt and Relevant's rights and obligations reorganized.

As planned, Hyatt thus failed to obtain an assumption of the MOA from Relevant as a condition of the transfer of Hyatt's management rights to Relevant,

Yet Hyatt and Relevant's attempt to evade the Union proves futile, as Hyatt clearly breached the plain language of the MOA. Paragraph 15 of the MOA requires that "in the event that the Employer sells, transfers, or assigns all or any part of its right, title, or interest in a Hotel or substantially all of the assets used in the operation of a Hotel, … the Employer… agrees that as a condition to any such sale, assignment, or transfer, the Employer will obtain from its successor or successors in interest a written assumption of this Agreement[.]" JX 1, ¶ 15.

The plain meaning rule "states that if [] words are plain and clear, conveying a distinct idea, there is no occasion to resort to interpretation, and their meaning is to be derived entirely from the nature of the language used." Elkouri & Elkouri, *How Arbitration Works*, 9.2.A (Kenneth May et al. eds., 8th ed. 2016) (hereinafter "*How Arbitration Works*"). Moreover, "in the absence

of a variant contract definition[,] … [a]rbitrators give words their ordinary and popularly accepted meaning." *Id.* at 9.3.A.I (footnotes omitted).

Although Hyatt will argue it did not "sell, transfer, or assign" anything in the restructuring of its deal with Relevant, such that the successor clause does not apply, the ordinary definition of the word, "transfer," belies Hyatt's claim. Even the most-consulted legal dictionary explains that the word, "transfer" is inclusive of all types of conveyances and the finding of a transfer is not conditioned on certain formalities like the imposition of a specific tax or letter or transfer. *See* Black's Law Dictionary (11th ed. 2019).

Uncontradicted testimony from the Union further confirms that the purpose of the successor clause was that "if Hyatt were no longer going to manage that property and be the employer, it's [Hyatt's] obligation to get the next operator … to sign and assume this agreement." Tr. 45:15-23 (Petersen). Hyatt produced no testimony indicating that the mutual intent of the Parties was to exclude specific types of transfers. The Termination and Franchise Agreements thus certainly effectuated a transfer of "all or any part of [Hyatt's] right, title, or interest in a Hotel" of within the meaning of the MOA. JX 1, ¶ 13.

Hyatt will similarly argue that the MOA does not apply because Relevant does not meet the definition of the phrase, "successor or successors in interest." But Relevant is undoubtedly the successor to Hyatt's management interest. Reading Paragraph 15 as a whole, it is apparent that the phrase "successor or successors in interest" simply refers to the entity or entities to which Hyatt "sells, transfers, or assigns all or any part of [the Employer's] right, title, or interest in a Hotel or substantially all of the assets used in the operation of a Hotel[.]" JX 1, ¶ 15. Therefore, when Hyatt transferred all or part of its management interest in the Hotels to Relevant, Relevant was *a priori* a successor in interest within the meaning of Paragraph 15.

Alternatively, the ordinary definition of the phrase, "successor in interest" confirms that Relevant is Hyatt's successor in interest. A "successor in interest" is "[s]omeone who follows another in ownership or control of property." Black's Law Dictionary. Because as a result of the business reconfiguration, Relevant followed Hyatt in the control of the Hotels' operations, Relevant is undeniably Hyatt's successor in interest under the MOA.

If the Arbitrator had any doubts as to the clause's application to the specific mode of transfer here, arbitral precedent supports the broad reading of successorship clauses in labor agreements. *See Summit Associates, Inc.*, 1997 LA Supp. 101889 (Fullmer, 1997) (finding employer breached successor clause of CBA where, to avoid foreclosure on hotel businesses, employer deeded over hotels to federal bank); *see also Wheelabrator Envirotech Operating Servs. Inc. v. Massachusetts Laborers Dist. Council Loc. 1144*, 88 F.3d 40 (1st Cir. 1996) (confirming arbitrator's award which found employer liable under successor provision even where employer had no privity with successor operator); *see, generally, Marley-Wylain Co.*, 88 LA 978, 983 (Jacobowski, 1987) (stating that "the intent and purpose of successor language is to have the contract continue and be binding on a successor and that the reference to a successor in a contract is meaningful"). Thus, the Arbitrator should find that Hyatt breached the MOA when it failed to obtain an assumption of the MOA from Relevant as a condition of the Termination Agreements, the Franchise Agreements, or otherwise.

Hyatt may argue that its nonperformance should be excused because it made good faith efforts to get Relevant to assume the MOA and because Relevant exacted pressure on Hyatt to agree to a franchise deal on Relevant's terms. But successor clauses "impos[e] a duty on [the employer] to succeed in obligating its successor, not simply a duty to try." *See Wheelabrator*, 88 F.3d at 45. To overlook Hyatt's nonperformance here would also set a dangerous precedent for

employers and developers in the Los Angeles area keen on evading unions. Thus, the Arbitrator should find that Hyatt's breach, under the circumstances here, was indefensible.

As a remedy for Hyatt's breach, the Arbitrator should order Hyatt to obtain an assumption of the MOA from Relevant. The Arbitrator possesses this authority by the express language of the MOA, which states that "[t]he arbitrator shall have the authority to order the non-compliant party to comply with this Agreement." JX 1, ¶ 13.

Hyatt may argue that the Arbitrator should deny the Union specific performance because performance would be impossible. Yet the ongoing and close business relationship between Hyatt and Relevant at the tommie and the Thompson renders Hyatt's argument meritless. Under the Termination and Franchise Agreements, Hyatt possesses significant rights of control over Relevant in Hyatt's capacity as franchisor. *See* JXs 37-38. Hyatt's prior investment of key money in the Hotels reveals Hyatt's deep pockets as another powerful source of leverage over Relevant, an apparently debt-ridden company. Hyatt's ownership of the *tommie* and the *Thompson* brands is yet another source of influence which Hyatt holds over Relevant, as the Hotels are already open and operating under those brand names.

Hyatt further argues that the Arbitrator must engage in a balancing of equities before he may grant an order of specific performance. But the MOA imposes no such limitation on the Arbitrator's authority. Even if the Arbitrator elects to balance the equities, they obviously favor Local 11. During Hyatt and Relevant's negotiations over Termination and the Franchise Agreements, about which the Union was kept in the dark, Hyatt did not even *try* to obtain an assumption of the MOA from Relevant. Hyatt should neither be rewarded for the dereliction of its contractual duties, nor for its bad faith participation in a Relevant's subterfuge.

The Arbitrator should further award specific performance since damages are a wholly inadequate substitute for the loss of employees' voice in the workplace. The inadequacy is heightened here given that Hyatt has approved none other than Relevant – an employer that has demonstrated its hostility to union organizing – to serve as the Hotels' new operator.

In contrast, an order of specific performance would result in no discernable harm to Hyatt, as Relevant has agreed to indemnify Hyatt for the costs associated with this arbitration. Moreover, the tommie and the Thompson are now open and operating. Thus, despite Hyatt's breach of the MOA, Hyatt continues to profit from the operation of the Hotels in its capacities as franchisor and as owner of the *tommie* and the *Thompson* brands.

Furthermore, Hyatt's argument that the Union's hands are unclean is baseless. Though Hyatt claims the Union is at fault because it failed to execute an owner's letter with Relevant, this argument is nothing more than a classic case of projection. Because Hyatt failed to do what it was contractually obligated to do, now, Hyatt argues that the Union should have gotten Relevant to sign a separate card check/neutrality agreement, which would have obviated Hyatt's need to fulfill its contractual obligations. Unlike Hyatt, the Union was not responsible for protecting Hyatt's interests. If Hyatt did not like the terms of the MOA, it had full agency to refuse to sign the contract. Instead, Mr. D'Angelo participated in drafting and signing the MOA. Thus, the equities strongly support the Arbitrator's order of specific performance.

Hyatt lastly argues that California Civil Code section 3390, subdivision (d) prevents the Arbitrator from ordering specific performance. But the MOA is silent as to the incorporation of state law. Instead, Paragraph 13 of the MOA provides that "[t]he arbitrator shall have no authority to alter, amend, add to, subtract from or otherwise modify or change the terms and conditions of this Agreement[.]" JX 1, ¶ 13. Should the Arbitrator read California Civil Code section 3390,

subdivision (d) into the MOA, he would impermissibly subtract from his authority to order the non-compliant party to comply with the Agreement. *See, e.g.*, *Transamerica Delaval, Inc.*, 85 LA 321, 322-25 (Bridgewater, 1985) (refusing to consider otherwise relevant provision in the California Labor Code, where the agreement was silent as to the applicability of state law, because the parties agreed that "the arbitrator's decision shall … not add to, subtract from, alter or amend the scope and terms of this Agreement").

Moreover, the Union could not find even one case or labor arbitration decision which relied on subdivision (d) to prevent specific enforcement of an agreement. Thus, California Civil Code section 3390, subdivision (d) does not prevent the Arbitrator from ordering Hyatt to comply with the MOA. *See 201097-AAA*, 2017 LA Supp. 201097 (Bodah, 2017) (finding "no assistance in external law" to the resolution of the grievance where "none of the court case [sic] cited by the Union contain a fact pattern similar enough to the case at hand").

For all these reasons, the Arbitrator should order Hyatt to comply with the MOA by obtaining an assumption of the MOA from Relevant.

## II. ISSUES SUBMITTED

The Parties agreed on the following joint issue statement prior to the arbitration:

1. Did Hyatt Hotels Corporation breach the memorandum of agreement of April 5, 2019, by failing to get Relevant Group to assume the obligations thereof under the termination of management agreements or franchise agreements or otherwise, which deprived Local 11 of its right and benefits under the MOA related to the Thompson and tommie Hollywood?

2. And if so, what is the appropriate remedy?

Tr. 9:12-10:13 (Gonzalez).[1]

[1] A reference to "JX___" is to a joint exhibit. A reference to "UX__" is to a Union exhibit. "EX__" refers to an Employer exhibit. References to "Tr.__:__" are to the page(s) and the line(s) of the transcript.

## III. RELEVANT CONTRACT PROVISIONS

Paragraph 15 of the Memorandum of Agreement ("the MOA" or "the Agreement") provides:

> In the event that the Employer sells, transfers, or assigns all or any part of its right, title, or interest in a Hotel or substantially all of the assets used in the operation of a Hotel, or in the event there is a change in the form of ownership of the Employer, the Employer shall give the Union reasonable advance notice thereof in writing, and the Employer further agrees that as a condition to any such sale, assignment, or transfer, the Employer will obtain from its successor or successors in interest a written assumption of this Agreement and furnish a copy thereof to the Union, in which event the assignor shall be relieved of its obligations hereunder to the extent that the assignor has fully transferred its right, title, or interest.

JX 1, ¶ 15. Paragraph 13 of the MOA provides, in part:

> … The arbitrator shall have the authority to order the non-compliant party to comply with this Agreement. …

JX 1, ¶ 13.

## IV. STATEMENT OF FACTS

### A. Background

UNITE HERE Local 11 ("Local 11" or "the Union") is a labor union which represents about 35,000 hospitality workers throughout Southern California and Arizona. Tr. 27:17-38:20 (Petersen); EX 40, p. 2. About half of Local 11's members are hotel workers. *Id.* Kurt Petersen, Co-President of Local 11, oversees the operation of the Union in conjunction with two other co-presidents. Relative to the other co-presidents, Mr. Petersen's focus is hotels. He oversees union negotiations with hotels, organizing campaigns at hotels, and anything else involving hotels. Tr. 28:2-20 (Petersen). Mr. Petersen has served as Co-President for the last five years and has worked for UNITE HERE since 1995. Tr. 27:20-28:3 (Petersen).

### B. Relevant Granted Hyatt the Right to Manage the tommie and the Thompson in Two Parallel Hotel Management Agreements

Hyatt Hotels Corporation ("Hyatt" or "the Employer") acquired the *tommie Hotels* brand and the *Thompson Hotels* brand[2] from Two Roads Hospitality around 2018. Tr. 56:3-57:24 (Cramer). Relevant Group ("Relevant), the owner and developer of two hotels bearing the tommie and Thompson brand names – the tommie Hollywood ("the tommie") and the Thompson Hollywood ("the Thompson") (collectively, "the Hotels") – signed two Hotel Management Agreements (HMAs) with Two Roads Hospitality for the tommie and the Thompson, respectively, on March 3, 2015. [3] JXs 2 & 3. Hyatt assumed those HMAs when it acquired Two Roads Hospitality. JXs 2 & 3; Tr. 55:20-23; 56:23-57:7 (Cramer).

Under HMAs, Hyatt possesses "the sole and exclusive right and obligation … to supervise, direct and control the management, operation and promotion of the [the tommie and the Thompson[.]" The HMAs further detail that Hyatt possesses "authority, control and discretion in the management and operation of the Hotel[s], without interference, or disturbance [from Relevant] in all operating matters[,]" subject to other terms of the agreements. JXs 2 & 3, § 3.1.1.[4]

[2] The use of italics is to distinguish the *tommie* and the *Thompson* brands, intangibles which Hyatt owns, from the tommie Hotel and Thompson Hotels, the two Los Angeles hotels at the center of this arbitration.

[3] The signatories to the Thompson HMA were 1400 Cahuenga Hotels LLC and Thompson Hotels, LLC. and the signatories to the tommie HMA were 6516 tommie Hotel LLC and tommie Hotels, LLC. JX 2, p. 73; JX 3, p. 73. Nonetheless, the Arbitrator should note that 1400 Cahuenga Hotels LLC and 6516 tommie Hotel LLC are subsidiaries of Relevant. The Arbitrator should further note that the HMAs were originally negotiated by Two Roads Hospitality, which owned Thompson Hotels, LCC and tommie Hotels, LLC. It is undisputed that when Hyatt acquired Two Roads Hospitality, it acquired the Thompson Hotels, LLC and the tommie Hotels, LLC. Tr. 56:3-57:24; 75:13-21 (Cramer); Tr. 221:2-5 (D'Angelo). Therefore, although neither Hyatt nor Relevant is expressly named in the HMAs, neither of the Parties disputes that at all times relevant to this arbitration, Hyatt and Relevant were the parties to the HMAs.

[4] Joint Exhibits 2 and 3 are nearly identical agreements, but Joint Exhibit 2 is for the Thompson and Joint Exhibit 3 is for the tommie. Throughout this brief the Union cites to contract language which is contained in both of the agreements using the following format: JXs 2 & 3, § ___. Joint Exhibits 35 and 36, which are the Termination of Hotel Management Agreements for the Thompson and the tommie, respectively, are similarly identical. Thus, the Union cites to the agreements, collectively, in the same format: JXs 35 & 36, § ___. The same is again true for Joint Exhibits 37 and 38, which are the Franchise Agreements covering the Thompson and the tommie, respectively. Thus, the Union cites to those agreements as follows: JXs 37 & 38, § ___.

Sections 3.1 through 3.2 of each of the HMAs further detail Hyatt's duties and rights as operator of the Hotels, including (but not limited to) the right to "hire, promote, discharge, supervise, train, and determine the terms of employment for the general manager and through him or her, all other personnel for operating, service, administrative, spa, restaurant, bar and food service positions[,]" as well as the right to determine room rates, create all advertising and promotions, and enter into contracts, leases, and other agreements for any hotel and service operations. JXs 2 & 3, §§ 3.1-3.2; *see also* Tr. 93:8-94:15 (Young).[5]

According to Hyatt's Vice President of Lifestyle Development and Owner Relations, Catie Cramer, the tommie and the Thompson were "critically important" and "incredibly strategic… lifestyle assets" for the Hyatt brand, especially as Hyatt had been underrepresented in the Los Angeles market before their acquisition. Tr. 55:18-56; 57:25-58:10 (Cramer). As a result, Hyatt had publicized the Hotels before their opening broadly. All this strengthened Hyatt's motivation to effectuate the smooth opening and operation of the Hotels. Tr. 69: 23-70:24 (Cramer).

### C. After Three Months of Negotiation, on April 5, 2019, Local 11 and Hyatt Entered into an MOA Which Contained Card Check/Neutrality Provisions and a Successorship Clause Governing the tommie and the Thompson

Around late 2018, Hyatt and Relevant began discussing their desire to execute a card check/neutrality agreement with the Union at the tommie and the Thompson. Tr. 173:13-174:18 (D'Angelo). Specifically, Relevant directed Hyatt to enter into the agreement. Tr. 197:10-16 (D'Angelo). Hyatt and Relevant agreed that Relevant's attorney, Ken Ballard, would contact Local 11 to gauge its interest. Tr. 30:6-23; 33:7-9 (Petersen). Mr. Petersen met with Mr. Ballard, as well

[5] For purposes of this brief, we refer to this bundle of rights collectively as Hyatt's "management rights," its "right to manage," or its "management interest."

as Richard Heyman, a principal and co-founder of Relevant, to begin negotiating the details of the agreement. Tr. 30:14-9; 31:11-21 (Petersen).

Relevant and Hyatt represented to the Union that Hyatt was going to serve as "the employer/operator of [the tommie and the Thompson]," and specifically "the employer of the employees in the bargaining unit." Tr. 30:25-33:8 (Petersen); *see also* Tr. 192-21-193:3 (D'Angelo) (stating that "under the HMA, [Hyatt] [is] the one[] who w[as] supposed to be dealing with employee relations, labor relations, things of that nature"). In fact, even though the Hotels were still under construction, Hyatt had already hired a general manager who was working on site pursuant to its authority as the Employer under the HMAs. Tr. 33:1-9 (Petersen).

Relevant and Local 11 continued to negotiate over the terms of the card check/neutrality agreement in person, by phone, and via email over the next three months. Tr. 31:1-35:12, 147:8-17 (Petersen); Tr. 167:24-168:4 (D'Angelo). On March 19, 2019, Local 11 informed Mr. D'Angelo that Local 11 and Relevant had reached a tentative deal and sent Mr. D'Angelo the proposed terms for Hyatt's review. Tr. 34:16-39:9 (Petersen); JX 13.

Two days later, on March 21, Hyatt signaled its general agreement with the terms when Mr. D'Angelo e-mailed Local 11 with only a few comments on the draft agreement. Tr. 39:16-41:14, 132:16-133:12 (Petersen); Tr. 185:12-186:23 (D'Angelo); JX 14, p. 52-54. The next day, Mr. Petersen replied that he would review and respond to Mr. D'Angelo's comments. Tr. JX 14, p. 52. Mr. D'Angelo and Mr. Petersen then exchanged a further draft of the agreement. Tr. 187:8-24 (D'Angelo); EX 16.

On April 5, 2019, Local 11 and Hyatt finally signed a Memorandum of Agreement ("the MOA" or "the Agreement"), which memorialized the agreed upon terms for the tommie and the

Thompson, as well as for other hotels in Los Angeles which are not at issue in this arbitration. [6] Tr. 41:12-42:1; JX 1; UX 41. Paragraph 3 of the MOA expressly holds that the agreement "shall apply to the Thompson Hollywood and tommie Hollywood currently under development[.]" JX 1, ¶ 3.

The MOA lays out card check/neutrality procedures which guarantee an "orderly environment for the exercise by the Employer's Employee of their rights under Section 7 of the National Labor Relations Act … in the event that the Union decides to conduct an organizing campaign among Employees" at the tommie and the Thompson. JX 1, ¶¶ 5-15; Tr. 44:4-8 (Petersen). The Parties also included a successorship clause in the MOA, which imposes an active obligation on Hyatt to obtain an assumption of the MOA from the successor operator of the tommie and the Thompson. JX 1, ¶ 15; Tr. 45:15-23; 136:6-22 (Petersen).

As far as Local 11 knew, Hyatt was to be employer of the employees at the hotels. Tr. 32:20-33:6, 43:23-44:20 (Petersen). Thus, there was no need to ask Relevant to execute any kind of owner's letter guaranteeing the same employee protections. Tr. 33:10-21, 134:4-14 (Petersen).

### D. When Relevant Realized that the MOA Would Hurt Financing Efforts, Hyatt and Relevant Conspired to Extinguish the Union's Rights in the tommie and Thompson by Rearranging their Business Plans at the Hotels

In the summer of 2019, Relevant began to express to Hyatt what the Union can only term, "developer's remorse" over the MOA. Allegedly, the MOA had resulted in a negative financial value to the projects. Tr. 80:17-22 (Cramer). Relevant also complained that Hyatt never had the

[6] The MOA, in fact, covers all "full service hotels" owned whole or in majority part by Hyatt in Los Angeles County as well as all hotels newly managed by Hyatt in the City of Los Angeles, with some exclusions irrelevant to the matter here. JX 1, ¶¶ 1-2. Paragraph 3 of the MOA states categorically that "this Agreement shall apply to the Thompson Hollywood and tommie Hollywood ("Hotels") currently under development subject to the following conditions identified in Attachment 'B.'" JX 1, ¶ 3. Attachment B concerns the scope of the intended bargaining unit as well as the process and timing under which the Union may seek recognition at the Hotels. *See* JX 1, p. 136. These conditions are not at issue in this arbitration.

right to enter the MOA notwithstanding the fact Relevant itself had negotiated and instructed Hyatt to execute it. Tr. 61:16-69:6 (Cramer); Tr. 199:22-25 (D'Angelo). Hyatt maintained – and continues to maintain – that it did have the authority to enter the MOA. Tr. 66:8-13, 97:17-21 (Cramer); Tr. 196:3-17 (D'Angelo); *see* Tr. 83:8-21 (Cramer); EX 31.

Hyatt and Relevant sent letters back and forth over this and other issues until Relevant threatened Hyatt with termination of the HMAs and legal action unless Hyatt agreed to amend the HMAs on Relevant's terms. Tr. 67:2-69:2; *see* EXs 21-23. Despite the fact that Hyatt strongly believed it had the authority to execute the MOA, Hyatt yielded to Relevant's request because the tommie and the Thompson were Hyatt's "trophy assets." Tr. 69:22-70:9 (Cramer). Hyatt had publicized the Hotels' opening broadly. Tr. 68:7-15, 69:16-19 (Cramer). As a result, any delays to their openings would have been damaging for the brand. Tr. 69:20-70:9, 102:18-103:7 (Cramer).

Losing the projects entirely would have been even more destructive. Hyatt was "completely affiliated with the project[;]" it had already hired employees on-site. Tr. 201:16-202:10 (D'Angelo). Hyatt had also expended "… significant internal resources from a labor perspective, counsel, just hours and hours on the projects." Tr. 78:24-79:9 (Cramer). Losing them would cause Hyatt "a great deal of brand damage." *Id.* All of these factors apparently cemented Hyatt's motivation to appease Relevant, at any cost to the Union. Tr. 70:2-9 (Cramer).

Hyatt and Relevant thus negotiated amendments to the HMAs from the spring of 2020 until the spring 2021. Tr. 70:14-71:17 (Cramer); *see* EXs 25-26. A major subject of the negotiations was the revision of the labor relations language in the HMAs. Tr. 71:7-73:23, 74:11-75:22 (Cramer); *see* EXs 24-27. Specifically, Hyatt and Relevant negotiated over the inclusion of Section 3.3.5(a) in the HMAs. At one point, Hyatt proposed including language which recognized the MOA. EX 26, § 3.3.5(a); *see* EX 25, p. 439.

Yet just as Hyatt and Relevant were preparing signatures to finalize the amendments, Relevant pulled the plug, again citing the MOA as a chief reason. Tr. 75:23-77:21, 77:22-78:18 (Cramer); *see* EXs 29 & 30. Relevant told Hyatt that it was "as a result of the union agreement, that the operating of the hotels was too expensive and … their proposed partner would not finance and fund the projects unless [Hyatt] entered into a franchise agreement so that [Relevant] w[as] not required … to enter into the union agreement or maintain a union agreement." Tr. 78:12-18 (Cramer).

In place of amendments to the HMAs, Relevant proposed that Hyatt and Relevant enter into franchise agreements for the Hotels. Tr. 78:10-80:22 (Cramer); *see* EXs 29 & 30. After exchanging letters back and forth on this issue (Tr. 81:8-85:13 (Cramer); *see* EXs 31-33), on March 26, 2021, Hyatt told Relevant that if Relevant wanted "to find a transactional path forward, … [Hyatt] will … reach[] out to [Relevant] again shortly to discuss *the parameters under which Hyatt would consider entering into franchise agreements for these hotels*." EX 34 (emphasis added).

Even though Mr. D'Angelo believed that Relevant was attempting to circumvent the MOA, neither Mr. D'Angelo nor anyone else at Hyatt took any care to inform the Union of Relevant's intentions to cut the Union out of the picture. *See* Tr. 199:8-25-200:14 (D'Angelo).

### E. Two Days Before the Opening of the Thompson, on August 6, 2021, Hyatt and Relevant Terminated the HMAs and Entered into Franchise Agreements for the tommie and the Thompson

On August 6, 2021, Hyatt and Relevant entered four different agreements which effectuated the transfer of Hyatt's management rights in the tommie and the Thompson to Relevant. Hyatt and Relevant signed two Termination of Hotel Management Agreements, one for the tommie, and the other for the Thompson ("the Termination Agreements"), and two Franchise

Agreements, again, one for each of the Hotels ("the Franchise Agreements"). *See* JXs 35-38; Tr. 50:6-51:4 (Petersen); Tr. 85:14-86:14 (Cramer).

At the time that Hyatt and Relevant signed the Termination Agreements and Franchise Agreements, Relevant had no right to terminate the HMAs unless there was a sale of the Hotels. Tr. 95:17-25 (Cramer); *see* JXs 2 & 3, § 10.3. Relevant's right to terminate the HMAs only kicked in after the first five years of operation. Yet out of fear of damaging *the tommie* and *the Thompson* brands and receiving bad press, Hyatt capitulated to Relevant's demands. Tr. 68:7-15; 69:16-19 (Cramer).

The Termination Agreements each contain an indemnification provision, whereby Relevant agrees to indemnify Hyatt for "any purported rights asserted by any labor organization related to [each] hotel." JXs 35 & 36, ¶ B.6.(c). The Termination Agreements also state that "as a condition precedent to the termination of the Management Agreement contemplated in [the] Termination Agreement," Relevant must pay Hyatt "all amounts due to Hyatt in accordance with the Management Agreement" and must "enter into a franchise agreement on terms mutually acceptable" to Hyatt and Relevant for the operation of each Hotel. JXs 35 & 36, ¶ B.2 (bolded emphasis removed). Moreover, the Termination Agreements permit that either Relevant or a "Successor Manager" will operate the Hotels. *Id.*

Under the Franchise Agreements, Hyatt has final approval which entity shall operate the Hotels. JXs 37 & 38, Art. IV, § 4.2. Hyatt must even approve Relevant as operator. JXs 37 & 38, Art. IV, § 4.2(a) (stating that "Franchisee may not itself manage the Hotel without Hyatt's approval of Franchisee as the Hotel's operator"). Hyatt approved Relevant to operate the Hotels.

The Thompson opened just two days after Hyatt and Relevant executed the four agreements, on August 8th, 2021. Tr. 98:14-22 (Cramer). The tommie opened in December 2021, just weeks before the arbitration hearing. Tr. 98:14-22 (Cramer); Tr. 49:23-50:5 (Petersen).

### F. The Termination and Franchise Agreements Granted Relevant the Right to Manage the tommie and the Thompson, but Omitted Relevant's Obligation to Assume the MOA

While the Termination and Franchise Agreements were entered on mutually beneficial terms to Hyatt and Relevant, none of the four agreements conditioned Relevant's acquisition of management rights in the Hotels on the assumption of the MOA. *See* JXs 35-38. Hyatt never even *attempted* to have Relevant assume the MOA as part of the Termination or the Franchise Agreements. Tr. 84:15-25; 106:17-110:1 (Cramer).

When asked on direct and on cross *why* Hyatt did not attempt to assign the MOA during the negotiations over those agreements, Ms. Cramer testified three separate times that she did not know. Tr. 84:20-25, 106:21-24, 108:10-11 (Cramer). Ms. Cramer *never* testified that at the time that Hyatt and Relevant negotiated the Franchise deal, Hyatt believed it had no legal obligation to obtain an assumption of the MOA as it so argues today. Instead, Ms. Cramer only testified once, with apparent hesitation, that she "can't say why that agreement wasn't assigned other than *there may have not been*, from our perspective, the legal obligation to do so" and recalling that she encouraged Relevant to assume the MOA solely out of fear of picketing and bad press – not a genuine legal obligation. Tr. 108:14-21 (Cramer) (emphasis added); *see* Tr. 83:1-13 (Cramer).

Ms. Cramer's testimony also revealed that Hyatt *knew*, as early as March of 2021, that Relevant devised the franchise plan precisely to circumvent the MOA. Tr. 77:8-78:18 (Cramer) (stating that at the time Relevant pulled out of the HMA amendment, Relevant said "their proposed partner would not finance and fund the projects unless [Hyatt and Relevant] entered into a

franchise agreement *so that [Relevant] w[as] not required to enter – to enter into the union agreement or maintain a union agreement*") (emphasis added).

Conversely, Mr. D'Angelo testified that provisions regarding compliance with the MOA were not included in the Termination Agreements and Franchise Agreements, first, because "it's something that would not be included in the termination agreement, terminated our HMA and [Hyatt's] rights thereunder," and, second, "it's something that's not appropriate for a franchise agreement." Tr. 167: 4-168:5, 216:15-20 (D'Angelo). When asked what he meant by the fact that it is not appropriate to include an assumption of the MOA as a term of the franchise agreement, Mr. D'Angelo responded that "having a brand such as Hyatt bind a franchisee to card check neutrality raises *a whole host of complicated issues*, including antitrust – potential anti-trust violations." Tr. 216:21-217:1 (D'Angelo) (emphasis added).

Despite the apparent existence of all these reasons, Hyatt never gave Local 11 a written explanation as to why it was not legally obligated to obtain an assumption of the MOA from Relevant. In fact, Hyatt did not even give the Union written notice to politely let the Union know that it would no longer be managing the Hotels. Instead, in June 2021, just weeks before from the opening of the Thompson, Mr. Petersen received a belated call from Hyatt, informing him that Hyatt would no longer be managing the Hotels. Tr. 49:10-50:5 (Petersen).

### G. When Relevant Refused to Abide by the MOA, Local 11 Promptly Initiated Arbitration Against Hyatt

In June or July of 2021, Mr. Petersen contacted Relevant to ask whether Relevant would honor the MOA. Tr. 51:16-20 (Petersen). Local 11 received conflicting messages. First, Mr. Heyman told Mr. Petersen that Relevant would indeed abide by the card check/neutrality agreement and honor the MOA. Tr. 51:16-52:2 (Petersen). Then, when Mr. Petersen spoke to Dan Daley, Relevant's proposed general manager and head of operations of the Hotels, Mr. Daley

stated that he was unsure of whether Relevant would abide by the MOA. Tr. 52:4-6 (Petersen); Tr. 62:17-20 (Cramer). Finally, Mr. Petersen spoke to Andrew Shayne, Partner and CFO at Relevant, who stated that Relevant did not intend to honor the MOA because Mr. Heyman was not authorized to enter those agreements on behalf of Relevant. Tr. 52:7-15 (Petersen). The very next month, the Union demanded arbitration.

### H. Hyatt Maintains a Close Business Relationship with Relevant at the tommie and the Thompson in Hyatt's Capacity as Franchisor

Since the August 6th signing of the Franchise Agreements, Relevant has always been and continues to be the manager and operator of the Hotels. Tr. 50:6-11 (Petersen); Tr. 204:20-23 (D'Angelo); Tr. 86:15-20 (Cramer). In its capacity as manager, Relevant "oversee[s]" and "employ[s]" the hotels' employees, "control[s] HR," and can "grant… recognition of the Union." Tr. 23:22-24:2 (Grossman); *see* Tr. 86:12-23 (Cramer).

Hyatt, as franchisor, continues to profit from Relevant's operation of the Hotels. Tr. 14:2-8 (Young). The Hotels bear the *tommie* and *Thompson* brands, which Hyatt owns. When one accesses the tommie and the Thompson websites, one must pass through the "World of Hyatt" portal. Tr. 14:3-6 (Young).

## V. ARGUMENT

### A. By the Plain Language of the MOA, Hyatt Breached its Contractual Obligations to Local 11 When it Transferred its Right to Manage the tommie and the Thompson to Relevant without Requiring Relevant, its Successor, to Assume the MOA

#### 1. Principles of Interpretation

The plain meaning rule "states that if [] words are plain and clear, conveying a distinct idea, there is no occasion to resort to interpretation, and their meaning is to be derived entirely from the nature of the language used." Elkouri & Elkouri, *How Arbitration Works*, 9.2.A (Kenneth

May et al. eds., 8th ed. 2016) (hereinafter "*How Arbitration Works*"). Moreover, where contract language is ambiguous, "in the absence of a variant contract definition, or extrinsic evidence indicating that [words] were used in a different sense or that the parties intended some special colloquial meaning[,]" "[a]rbitrators give words their ordinary and popularly accepted meaning." *How Arbitration Works* at 9.3.A.I (footnotes omitted); *see also* Restatement (Second) of Contracts § 202 (1981) (explaining that "[u]nless a different intention is manifested, … where [contract] language has a generally prevailing meaning, it is interpreted in accordance with that meaning"). "[I]n the absence of a showing of mutual understanding of the parties to the contrary, the usual and ordinary definition of terms as defined by a reliable dictionary should govern." *How Arbitration Works* at 9.3.A.I.b.

Arbitrator Szuter helpfully summarizes these principles:

> The primary responsibility of an arbitrator is to interpret the agreement by finding and carrying out the mutual intent of the parties. There are several sources to locate the mutual intent. First and most obvious is the document itself. Second, perhaps in order of preference, is the bargaining history[.]

*City of Canton*, 131 LA 51, 61 (Szuter, 2012). Arbitrator Szuter further explains:

> The mutual intent must be first be drawn from the language alone. Unambiguous language must be given its plain meaning. A writing is unambiguous where the meaning can determined without more than the facts and the language. Plain meaning of contract language augmented by dictionary definitions is often sufficient to resolve interpretation issues. Initially the interpretation of a writing should be possible without resorting to any source other than the four corners of the Agreement.

*Id.*

**2. The Right to Manage the tommie and the Thompson is a "Right" Subject to the Successor Clause of the MOA**

On a plain reading of the MOA, Hyatt breached its contractual obligations to Local 11 when it transferred its right to manage the tommie and the Thompson to Relevant without requiring Relevant to assume the MOA. Paragraph 15 of the Memorandum of Agreement (MOA) provides,

> In the event that the Employer sells, transfers, or assigns all or any part of its right, title, or interest in a Hotel or substantially all of the assets used in the operation of a Hotel, … the Employer shall give the Union reasonable advance notice thereof in writing, and the Employer further agrees that as a condition to any such sale, assignment, or transfer, the Employer will obtain from its successor or successors in interest a written assumption of this Agreement and furnish a copy thereof to the Union[.]

JX 1, ¶ 15.

By the terms of the 2015 HMAs, Relevant granted Hyatt "… the sole and exclusive right and obligation during the Term to supervise, direct and control the management, operation, and promotion of the [the tommie and the Thompson] in accordance with the terms of [the HMAs]." JXs 2 & 3, Section 3.1.1. Section 3.1.1. further describes that Hyatt "… shall … have authority, control and discretion in the management and operation of the Hotel[.]" Sections 3.1 through 3.2 of the HMAs further detail Hyatt's duties as operator and manager of the hotels, including (but not limited to) the right to "hire, promote, discharge, supervise, train, and determine the terms of employment for the general manager and through him or her, all other personnel for operating, service, administrative, spa, restaurant, bar and food service positions[,]" as well as the right to determine room rates, create all advertising and promotions, and enter into contracts, leases, and other agreements for any hotel and service operations. JXs 2 & 3, Section 3.1-3.2; *see also* Tr. 93:8-94:15 (Young). By these terms, Relevant granted Hyatt the right to manage the tommie and the Thompson. JXs 2 & 3, Sections 3.1-3.2.

Hyatt's above-described management rights in the tommie and the Thompson are certainly a rights or interests within the meaning of Paragraph 15 of the MOA. By a plain reading of the HMAs, those rights arose the day that Hyatt and Relevant signed the HMAs, rather than when

Hyatt would first hire bargaining unit employees.[7] Though the MOA does not define the terms, "right, title, or interest[,]" the Arbitrator should easily conclude that Hyatt's management rights in the tommie and the Thompson were "rights" within the meaning of Paragraph 15 of the MOA.

First, a right to manage is, unambiguously, a right on a plain reading of the word "right." Nothing within the four corners of the MOA suggests any narrower interpretation of the word. Indeed, it appears not even Hyatt disputes that it had at least rights associated with the tommie and the Thompson.[8] *See* Tr. 19:12-16 (Grossman) (arguing that "Hyatt had no legal *interest* in either hotel[,]" but conceding that "[i]t had rights under its management agreements") (emphasis added). Thus, Hyatt's management rights in the Hotels were certainly rights within the meaning of the MOA.

"If an arbitrator finds that alternative interpretations of a clause are possible, one of which would give meaning and effect to another provision of the contract, while the other would render the other provision meaningless or ineffective, the inclination is to choose the interpretation that would give effect to all provisions[,] … 'because of the general presumption that the parties do not carefully write into a solemnly negotiated agreement words intended to have no effect.'" *How Arbitration Works* at 9.3.A.Viii.a.

If the Arbitrator fails to find that management rights are rights within the meaning of Paragraph 15, the effect of Paragraph 3 of the MOA, which specifically stresses the MOA's application to the tommie and the Thompson, would be severely reduced. Because both Local 11

---

[7] Hyatt may argue that its management rights never vested because the Hotels had not yet opened when Hyatt and Relevant scrapped the HMAs and instead signed the Termination and Franchise Agreements. Yet Hyatt had already hired a general manager who was working on site pursuant to its authority as the Employer under the HMAs long before the Hotels opened. Tr. 33:1-9 (Petersen). Thus, Hyatt's managements rights had certainly vested at the time that Hyatt transferred those rights to Relevant.

[8] Hyatt only appears to dispute that its management rights were "transferred" to Relevant and that Relevant was a "successor" or "successor in interest." Tr. 16:6-19:20 (Grossman).

and Hyatt were aware that the extent of Hyatt's interest in the tommie and the Thompson was limited to management rights at the time they signed the MOA, it would have been quite nonsensical of the Parties to include both Paragraph 3 of the MOA *and* a successorship clause which does not apply to tommie and Thompson. *See* Tr. 31:8-21, 43:23-44:20 (Petersen). Thus, the mutual intent of the Parties is clear: Hyatt's right to manage the tommie and its right to manage the Thompson were certainly intended to be "right[s]" within the meaning of Paragraph 15.

If there was any doubt, a brief review of the ordinary dictionary definitions of the term, "right" necessitates the same result. *See How Arbitration Works* at 9.3.A.I.b. According to Dictionary.com, a "right" is "a just claim or title, whether legal, prescriptive, or moral." (2022). Similarly, Black's Law Dictionary provides multiple alternative definitions of a "right," including,

> Something that is due to a person by just claim, legal guarantee, or moral principle <the right of liberty>. …[; or]
>
> A legally enforceable claim[9] that another will do or will not do a given act; a recognized and protected interest the violation of which is a wrong <a breach of duty that infringes one's right>…[; or]
>
> (*often pl.*) The interest, claim, or ownership that one has in tangible or intangible property <a debtor's rights in collateral> <publishing rights>.

(11th ed. 2019). While Hyatt's management rights likely meet all the alternate definitions of the word, "right," they undoubtedly constitute a legally enforceable claim that another will do or will not do a given act. That is, the HMAs contractually obligate Hyatt to serve as the operator of the Hotels, such that Relevant would breach the HMAs if it granted that same right to another. Similarly, the HMAs guarantee Hyatt the right to manage the Hotels, to the exclusion of any other actor. Thus, Relevant would have a legally enforceable claim against Hyatt in the event Hyatt

---

[9] The word, "claim," is defined in part as: "[t]he assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional <the spouse's claim to half of the lottery winnings>." Black's Law Dictionary.

refused to operate the Hotels and Hyatt's management rights are certainly a right within the meaning of Paragraph 15 of the MOA.

Alternatively, Hyatt's right to manage the tommie and the Thompson also satisfies the ordinary meaning of the word, "interest." Dictionary.com defines an interest as "a share, right, or title in the ownership of property, in a commercial or financial undertaking, or the like." Black's Law Dictionary defines an interest as,

> A legal share in something; all or part of a legal or equitable claim to or right in property <right, title, and interest>. • Collectively, the word includes any aggregation of rights, privileges, powers, and immunities; distributively, it refers to any one right, privilege, power, or immunity.

Black's Law Dictionary further defines, a "share," in pertinent part, as:

> An allotted portion owned by, contributed by, or due to someone; a single portion distributed among several[.]

Hyatt's management rights are thus also an interest under these definitions, because Hyatt's management rights Hotels were the "portion" or "share" of the Hotels' operation which Relevant legally promised to Hyatt by Relevant in the HMAs. For all these reasons, Hyatt's management rights constituted both rights and an interest within the meaning of Paragraph 15 of the MOA.

### 3. Hyatt Unquestionably Transferred its Right to Manage the tommie and the Thompson to Relevant

Under the MOA, where Hyatt either "sells, transfers, or assigns" all or any part of its management rights in the Hotels, Hyatt must, "as a condition to any such sale, assignment, or transfer, … obtain from its successor or successors in interest a written assumption of [the MOA.]" JX 1, ¶ 15. Here, Hyatt clearly transferred its right to manage the tommie and the Thompson hotels to Relevant, such that Hyatt's active duty to obtain an assumption of the MOA as a condition of the transfer was triggered.

Because the word, "transfer," is not defined in the MOA, the ordinary dictionary definition of the word governs. *How Arbitration Works* at 9.3.A.I.b. The successorship clause uses the word "transfer" twice – once as a noun and once as a verb. *See* JX 1. ¶ 15. Local 11 must show that a transfer occurred in both senses of the word to prove that Hyatt has breached the MOA.

Black's Law Dictionary defines the *noun*, "transfer," in part, as:

> *Any mode of disposing of or parting with an asset or an interest in an asset*, including a gift, the payment of money, release, lease, or creation of a lien or other encumbrance. • The term embraces *every method — direct or indirect*, absolute or conditional, voluntary or involuntary — *of disposing of or parting with property or with an interest in property*, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.

(emphases added). Dictionary.com defines the noun, "transfer," as, "a conveyance, by sale, gift, or otherwise, of real or personal property, to another." Black's Law Dictionary defines the *verb*, "transfer," in part, as:

> To convey or remove from one place or one person to another; to pass or hand over from one to another, esp. to change over the possession or control of. … To sell or give.

Similarly, Dictionary.com defines the verb, transfer (as in "transferred" or "transferring"), as:

> to convey or remove from one place, person, etc., to another: *He transferred the package from one hand to the other* [; or]
>
> to cause to pass from one person to another, as thought, qualities, or power; transmit
>
> [; or] *Law*. to make over the possession or control of: *to transfer a title to land.*
> to imprint, impress, or otherwise convey (a drawing, design, pattern, etc.) from one surface to another.

The undeniable effect of the Termination and the Franchise Agreements was to convey Hyatt's management rights in the Hotels to Relevant.[10] Neither the noun nor the verb definitions

---

[10] It is also notable that the word "assign" encompasses the word "transfer." That is, Black's Law Dictionary defines "assign" as, "[t]o convey in full; to transfer (rights or property)[.]" *See also* Dictionary.com (listing that one of the definitions of the word, "assign," is "to transfer"). In addition, Dictionary.com defines "assignment," in pertinent

of the word "transfer" require any specific mode of passing rights or interests for that conveyance to constitute a transfer. Nothing in the four corners of the MOA suggests any narrower construction of the word "transfer." Thus, the Termination and Franchise Agreements effectuated a transfer in both the noun and verb senses of the word. *See Martin Podany Associates*, 80 LA at 658, 663 (Gallagher, 1983) (where successorship clause required that employer obtain assumption of labor agreement as a condition of sale, lease, transfer, or assignment, arbitrator found employer violated agreement by failing to obtain such an assumption as a condition of its sale of substantially all of the business's assets).[11]

Hyatt argues that there could not have been a transfer within the meaning of the MOA because there exists "no evidence of a letter of transfer, evidence of imposition of a transfer tax, or any evidence of a substantive transfer." Tr. 17:9-16 (Grossman). But on a plain reading of the contract, and upon a review of the ordinary dictionary definitions of the word, transfer, in either its noun or its verb form, none of these items – whether a letter of transfer, imposition of a transfer tax, or another formality – are required to find that a transfer occurred.

Consistent with the ordinary purpose of a successorship clause – to ensure that the union's interest is protected in the event of a change to the business – uncontradicted testimony from the

---

part, as "the transference of a right, interest, or title, or the instrument of transfer." Thus, alternatively, Hyatt also assigned its management rights within the meaning of the MOA.

[11] Failing to find a transfer occurred here would also run contrary to arbitral policy which "recognizes that the intent and purpose of successor language is to have the contract continue and be binding on a successor and that the reference to a successor in a contract is meaningful." *Marley-Wylain Co.*, 88 LA 978, 983 (Jacobowski, 1987). In fact, arbitrators regard successorship language with such power that arbitrators have found that an employer is bound to obtain an assumption of the agreement from the successor *even where an agreement does not impose an active duty on the predecessor to do so*. For instance, in *Marley-Wylain Co.*, the Arbitrator found that even a brief reference to "successors" and "assigns" in the Introduction and Preamble to the collective bargaining agreement provided a sufficient basis upon which to find that an employer breached the contract when it sold its business to another without obtaining an assumption of the agreement. *Id.* at *983*.

By contrast, the MOA undoubtedly imposes on Hyatt an active duty to obtain an assumption of the MOA in the event of a transfer. Thus, the Arbitrator should find that the successorship clause here was intended to apply to the broadest range of scenarios which might constitute a "transfer" or an "assignment" of rights in the Hotels.

Union regarding the purpose of the successor language confirms that the successorship clause was intended to apply expansively. Mr. Petersen specifically testified that the intent of the successorship clause was to ensure that "if Hyatt were no longer going to manage that property and be the employer, it's their obligation to get the next operator of the successor operator employer to sign and assume this agreement." Tr. 45:15-23 (Petersen); *see also* Tr. 136:6-22 (Petersen). Under the Termination Agreements and the Franchise Agreements, Relevant became the next operator of the Hotels. Thus, when Hyatt failed to obtain an assumption of the Agreement from Relevant therein or otherwise, it breached contractual obligations. Importantly, Hyatt also provided no testimony indicating that the successor clause was <u>not</u> intended to apply where Hyatt's management rights were terminated by Relevant.

Hyatt may argue that because it made good faith efforts over several months to obtain an assumption of the MOA from Relevant in the amendments to the HMAs, its signing of the Termination Agreements and Franchise Agreements was an *involuntary* transfer and that such *involuntary* transfers must not be transfers for the purposes of the MOA. *See* Tr. 71:7-73:23; 74:11-75:22 (Cramer); *see* EXs 24-27.

But arbitral precedent rejects any notion that Hyatt's behavior was involuntary here. *See Summit Associates, Inc.*, 1997 LA Supp. 101889 (Fullmer, 1997) *Summit* concerned the interpretation of the successorship clause of a collective bargaining agreement (CBA) covering two Holiday Inn hotels, the Beachwood Holiday Inn ("HIB") and the Mayfield Village Holiday Inn ("HIM"), which were both owned by Summit Associates, Inc. ("Summit"). When Summit had initially purchased the hotels, it took out a 15-million-dollar loan from Dollar Bank. The hotels nonetheless failed to be profitable and the maturity date on the loan became imminent. *Id.*

Dollar Bank informed Summit that it would require either that the loan be paid off or otherwise Dollar Bank would foreclose on the HIB and the HIM. Summit and Dollar Bank thereon negotiated that in lieu of foreclosure, Summit would deed over the hotels to Dollar Bank to avoid the lengthy and costly process of formal foreclosure. *Id.* When Dollar Bank did not recognize the CBA, the union filed a grievance, alleging that Summit breached the CBA when it transferred the hotels to successor Dollar Bank without assumption of the CBA. The union based its position on the broadness of the successorship language in the agreement, which stated, in part:

> If during the term of this Agreement the Employer **sells, assigns or otherwise transfers** the business of the Beachwood Holiday Inn or the Mayfield Village Holiday Inn to which employees covered hereby render services, whether such transfer be by sales of stock or assets, or by franchise, lease or otherwise, the successor to such business shall be informed of this Agreement and the transfer of said business shall be made contingent upon the agreement by the successor to be bound by the terms, conditions and provisions of the within Agreement in the event it continues the business.

*Id.* (bolded emphasis added). Summit argued that it did not breach the CBA because the successorship provision should be read narrowly. Specifically, the employer argued that the successorship clause was not applicable in the event of an involuntary foreclosure. Summit also argued that it should not be held liable because the deeding over of the hotels was not an intentionally collusive tactic to avoid the successorship clause. *Id.*

The union disputed the employer's characterization of the deeding over of the hotels as an involuntary transfer. Instead, the union argued, "[i]t was a business decision made by the Employer as part of a negotiated deal with Dollar Bank[,]" and the substance of the deal shows that the Employer did have some bargaining power" – including that the agreement indemnified the employer for litigation involving the hotels – which Summit failed to use to obtain an assumption of the agreement. *Id.*

Finding no bargaining history or past practice indicating otherwise, Arbitrator Fullmer sustained the Union's grievance based on the broad plain language of the CBA. He reasoned that "the action of Summit in agreeing with Dollar to give a deed in lieu of foreclosure was both in form and substance a volitional act which was within the 'otherwise transfer' language of [the successor clause.]" *Id.*

The Arbitrator should similarly find that successorship clause of the MOA covers the transfer of management rights which occurred here because Hyatt's transfer was voluntary. As in *Summit*, Hyatt possessed unused leverage of many forms, which it could have used to influence Relevant's assumption of the MOA.

First, Hyatt could have withheld its consent to terminate the HMAs because at the time that Hyatt and Relevant signed the Termination Agreements and Franchise Agreements, Relevant had no right to terminate the HMAs.[12] Tr. 95:9-25 (Cramer); *see* JXs 2 & 3, § 10.1. Second, Hyatt could also have withheld franchising rights. These two sources of leverage would have been especially powerful had Hyatt withheld its consent to either agreement just days before the opening of the Thompson. Third, Hyatt had deep pockets, as evidenced by its investment of key money in the Hotels.

Hyatt failed to use even one ounce of this leverage to obtain an assumption of the MOA from Relevant. Hyatt's complaints that Relevant was difficult to work with, Relevant threatened to terminate the HMAs, Relevant threatened legal action against Hyatt, or that further negotiation

[12] Sections 10.1 and 10.3 of the HMAs provided a few exceptions to the general rule that Relevant had no right to terminate the HMAs. *See* JXs 2 & 3. Namely, Section 10.1 gave Relevant the right to terminate the HMAs in the event of Hyatt's default, by reason of Hyatt's failure to meet certain performance standards, or in the event of damage to or condemnation of the Hotel. *Id.* Section 10.3 also gave Relevant the right to terminate the HMAs in the event of sale of the Hotels. *Id.* Yet Hyatt presented no testimony indicating that any of these conditions existed at the time that Hyatt permitted Relevant to weasel out of the HMAs. Certainly, there had been no sale of the Hotels. Tr. 95:9-96:9 (Cramer). Instead, Relevant and Hyatt executed the Termination Agreements precisely to undermine the MOA. Tr. 78:12-18 (Cramer).

would have delayed the opening of the Hotels is no excuse. The existence of Hyatt's continuous bargaining power and its failure to utilize it makes Hyatt's transfer a volitional one. Thus, the Arbitrator should find that Hyatt transferred its management interest to Relevant under the plain meaning of the MOA.

**4. Relevant is Hyatt's Successor in Interest Because the Termination and Franchise Agreements Transferred the Right to Manage the tommie and the Thompson to Relevant**

The Restatement (Second) of Contracts also provides,

> Meaning is inevitably dependent on context. A word changes meaning when it becomes part of a sentence, the sentence when it becomes part of a paragraph. A longer writing similarly affects the paragraph. …Where the whole can be read to give significance to each part, that reading is preferred.

§202 cmt. d (1981); *see How Arbitration Works* at 9.3.A.Viii (stating that "[s]ections or portions cannot be isolated from the rest of the agreement and given construction independently of the purpose and agreement of the parties as evidenced by the entire document") (internal citations and quotations omitted). Elkouri & Elkouri recognize that "[i]n the arbitral domain, numerous decisions have invoked this interpretive principle." *Id.*

Relevant is certainly Hyatt's successor in interest under the plain language of Paragraph 15 of the MOA. Though the MOA does not a define the phrase, "successor or successors in interest," its meaning is implied when one reads Paragraph 15 as whole. That is, the phrase "successor or successors in interest" is a placeholder intended to refer to earlier language of the paragraph. Specifically, "successor or successors in interest" refers to the entity or entities to which Hyatt "sells, transfers, or assigns all or any part of [the Employer's] right, title, or interest in a Hotel or substantially all of the assets used in the operation of a Hotel[.]" JX 1, ¶ 15. A plain reading of the entirety of Paragraph 15 suggests that "successor or successors in interest" has no narrower meaning than this. Thus, if the Arbitrator finds that Hyatt transferred any part of its right

in the Hotels to another entity, that entity should *a prior* be deemed a successor in interest for the purposes of this provision.

A federal appeals court reached the same result where the court interpreted a CBA with equivalent successorship language to that at issue here. *See Wheelabrator Envirotech Operating Servs. Inc. v. Massachusetts Laborers Dist. Council Loc. 1144*, 88 F.3d 40 (1st Cir. 1996). In *Wheelabrator*, the employer, Environtech Operating Services ("EOS"), brought action against a labor union to challenge an arbitrator's finding that EOS breached the successor clause of the collective bargaining agreement when it failed to obligate the new operator of a city-owned water treatment plant, Operations Management International ("OMI"), to assume the CBA. The successor clause provided, in part:

> In the event the operation of the plant, in whole or in part, is assumed by any other entity, public or private, the successor organization ... shall agree to all terms and conditions of this Agreement.

*Id.* at 42. EOS argued that the OMI was not a "successor" within the meaning of the CBA because OMI lacked privity with EOS. *Id.* at 42-43. In fact, it was true that EOS and OMI did not have privity: EOS' contract with the city to operate the plant was set to expire, and OMI had successfully submitted a bid to take over the plant. Thus, no interest passed between EOS and OMI. Yet at the appellate court level, the union again prevailed. The First Circuit rejected the employer's argument that the successor provision did not apply. Instead, in reviewing the arbitrator's decision, it reasoned that

> while one could arguably read the phrase "successor organization" as importing a further restriction on the type of entities covered by the clause (*e.g.*, only those entities in privity with the predecessor), we do not think the text compels that interpretation. **To the contrary, we think one could permissibly read the text "any other entity" that has "assumed" "the operation of the plant" as defining the scope of the phrase "successor organization."** Thus, because OMI is an "entity" that has "assumed" the operation of the plant, the arbitrator's conclusion that OMI is a "successor" is consistent with the language of the clause.

*Id.* at 46. The term "successor or successors in interest" similarly imposes no further restriction as to the scope of the successorship clause in the MOA.

As in *Wheelabrator*, Arbitrator Fullmer found that the parties' use of the term, "successor," was immaterial in the grander context of a successorship clause. *Summit Associates, Inc.*, 1997 LA Supp. 101889 (Fullmer, 1997). In *Summit*, discussed earlier in Part V.A.3. of this brief, the employer, Summit, transferred its interest in two hotels by deed in lieu of foreclosure to Dollar Bank, an entity which had recently threatened foreclosure on the hotels. At the time the deeds were signed, Summit had a collective bargaining agreement in effect with a union which contained a successorship provision. The successorship language in the agreement stated, in part:

> If during the term of this Agreement the Employer sells, assigns or otherwise transfers the business of the Beachwood Holiday Inn or the Mayfield Village Holiday Inn to which employees covered hereby render services, whether such transfer be by sales of stock or assets, or by franchise, lease or otherwise, **the successor** to such business shall be informed of this Agreement and the transfer of said business shall be made contingent upon the agreement by **the successor** to be bound by the terms, conditions and provisions of the within Agreement in the event it continues the business.

*Id.* (bolded emphases added). Yet Dollar Bank did not recognize the CBA. The union thus brought arbitration to enforce the successor provision against Summit, based on Summit's failure to obtain an assumption of a collective bargaining agreement from Dollar Bank.

Summit argued that "Dollar Bank is not a successor contemplated by the successor language" because "[i]t was merely an owner/mortgagee in possession liquidating the property[.]" In finding for the Union, Arbitrator Fullmer rejected the notion that the term "successors" added any more to the successorship provision. He found that "the transfer was a breach of [the successor clause by Summit]" because "Summit did not make the transfer contingent upon the assumption by Dollar of the Union contract[.]" *Id.*

*Sexton's Steak House, Inc.* is also instructive. 76 LA 576 (Ross, 1981) In *Sexton's*, the employer, D'Onofrio, owned a restaurant which operated under a CBA with the Restaurant Workers Union. The CBA contained a successorship clause, which stated,

> "*This Agreement shall be binding on any and all* ***successors*** *and assigns of the Employer, whether by sale, transfer, merger, acquisition, consolidation or otherwise. The Employer shall make it a condition of transfer that the* ***successor*** *or assigns shall be bound by the terms of this Agreement.*"

*Id.* at 577 (bolded emphases added). D'Onofrio sought a buyer to take over the business when he faced bankruptcy. Buyer Shector agreed to buy most of the business's assets but refused to be bound by the CBA. An escrow was opened for sale, which included all of the business's assets except for items bearing the name of the business as well as the transfer of the liquor license and the goodwill of the business. Buyer Shector also took possession of the place of business during the escrow period. Shector offered jobs to any former employee willing to continue working. He changed the name of the business and spent $10,000 in updating the decor of the restaurant. *Id.*

When employer D'Onofrio failed to respond to the union's questions related to the sale of the business and whether the CBA would remain in effect, the Union filed a complaint with the San Diego Superior Court seeking enforcement of the successor clause. In court, the union obtained a restraining order enjoining the sale of the business unless the new owner agreed to be bound by the CBA. The judge also ordered the parties to arbitrate the matter and that the arbitrator "should determine whether or not the employer violated the contract by contracting to sell the business to Shector, and, if so, to specify the remedy." *Id.*

In arbitration, D'Onofrio argued that that successor clause did not apply because Shector was not a "successor" for purposes of the CBA's successorship clause. The employer reasoned that Shector was not a successor because Shector did not assume *all* of the business' assets - only

some, and because "[s]ubstantial changes [had] been made in the method of business, in the decor of the restaurant, and in the staffing[.]" *Id.* at 578.

Rejecting the employer's argument, the Arbitrator recognized that

> [the] contract speaks of "transfer" and "assigns." It does not specify what is required to be transferred or assigned, but does state that successors or assigns are required to be bound by the contract. It could only be intended to apply to anyone who obtains assets of the business with the intent of continuing substantially the same business or operation performed by the contracting employer, selling or transferring his business.[13]

Because Shector bought nearly all the assets of the business, including the liquor license and goodwill, as well as because Shector offered jobs of the same classification of work to the former employees, the bare fact that Shector changed the name, décor, and menu of the restaurant did not render Shector a non-successor. *Id.* The Arbitrator thus found that that "[t]he Employer breached the contract by failing to obtain, as a condition of the sale of the assets of his business, the agreement of the purchaser to be bound by the collective bargaining agreement." *Id.* at 579.

As in *Sexton's*, here, Relevant took over substantially the same interests which Hyatt possessed in the tommie and the Thompson pre-transfer. Yet unlike in *Sexton's*, here, the successorship clause here does <u>indeed</u> specify what rights or interests must be "transferred" or

---

[13] Notably, in *Sexton's*, Arbitrator Ross explained that employer D'Onofrio made the same mistake (which we presume Hyatt is making here) by relying on inapplicable precedent, in an attempt to demonstrate that buyer Shector was not a successor. *Id.* at 578. Arbitrator Ross stated, "[t]he *Howard Johnson* case …and the line of cases following *NLRB v. Burns International Security Service,* 406 U.S. 272 , 80 LRRM 2225 (1972 ), cited by the parties, deal with a different problem than the one that must be resolved in this matter. Those cases determine the obligation of the purchaser or successor to a business, to arbitrate grievances and the extent of obligation under the collective bargaining agreement executed by their predecessor. Our case is concerned with the obligation of the vendor of the business as required by a contract to which he is a party. … In our case, the Union is not seeking to enforce a contract against a successor employer, but against the party with whom it has an agreement. It is our task only to determine the intent of the parties in requiring the contracting employer to obtain, as a condition of any transfer, the agreement of the successor to be bound by the existing labor agreement." *Id.*

"assigned" such that Relevant would become a successor for purposes of the MOA. Specifically, the MOA requires that where Hyatt transfers "all or *any part* of its right, title, or interest in a Hotel or substantially all of the assets used in the operation of a Hotel[.]" it must obtain an assumption of MOA from its successor. JX 1, ¶ 15 (emphasis added). The breadth of this language cannot be ignored. The successorship language was designed to capture entities which amassed any part of Hyatt's rights in the tommie or the Thompson.

Moreover, as in *Wheelabrator* and *Summit*, the Arbitrator should reject Hyatt's attempt to inject additional meaning into the term, "successor in interest." Relevant is obviously the successor operator of the tommie and the Thompson.

Finally, the ordinary definition of the phrase supports the same conclusion. Though term, "successor or successors in interest" is undefined in the contract, Black's Law Dictionary defines "successor in interest"[14] as "[s]omeone who follows another in ownership or control of property" and explains "[a] successor in interest retains the same rights as the original owner, with no change in substance." Merriam-Webster[15] defines a "successor in interest" as:

> [A] successor to another's interest in property
>
> *especially* **:** a successor in ownership of a business that is carried on and controlled substantially as it was before the transfer[.]

*Merriam-Webster.com Legal Dictionary* (2022).

[14] Alternatively, Relevant is Hyatt's "successor in interest" because Relevant satisfies the ordinary definition of the word, "successor," and Relevant is the successor in Hyatt's management interest. Black's Law Dictionary defines the word "successor," as opposed to the phrase, "successor in interest," as "[s]omeone who succeeds to the office, rights, responsibilities, or place of another; one who replaces or follows a predecessor" or "[a] corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation." Dictionary.com defines a "successor" as, "a person or thing that succeeds or follows" or "a person who succeeds another in an office, position, or the like. (2022). Since Hyatt vested Relevant with its earlier rights and duties under the HMAs, Relevant is thus the successor to Hyatt's management interest/

[15] We utilize Merriam-Webster instead of Dictionary.com for this section as Dictionary.com contains no entry for the phrase, "successor in interest."

Here, Relevant was obviously Hyatt's successor in interest under the ordinary definition of the phrase, successor in interest. Under the HMAs, Hyatt possessed management rights in the tommie and the Thompson. *See* JXs 2 & 3, Sections 3.1-3.2. As a result of the Franchise and Termination Agreements, now Relevant possesses substantially the same management rights in the Hotels. *See* JXs 37 & 38.

Specifically, Section 2(b) of the Termination Agreement for the Thompson states,

> Owner shall … enter into a franchise agreement on terms mutually acceptable to each of Franchisor and Owner ("the Franchise Agreement") for the operation of the Hotel as a Thompson franchise by Owner or its approved manager ("the Successor Manager"), which operation shall commence on the Effective Date.

JX 35, § 2(b) (bolded emphases removed). The same provision is contained in the Termination Agreement for the tommie. JX 36, § 2(b). Section 4.2 of the Franchise Agreements provides, in part, that "[e]ither a Management Company that Hyatt approves pursuant to this Section 4.1, or Franchisee (if Hyatt approves Franchisee to manage the Hotel pursuant to this Section 4.1), must at all times retain and exercise direct management control over all aspects of the Hotel's business and must be the employer of the Hotel's Core Management and other personnel[.] JXs 37 & 38, Art. IV., § 4.2. Hyatt has approved Relevant to operate the Hotels. Thus, Relevant now "oversee[s]" and "employ[s]" the hotels' employees, "control[s] HR," and can "grant… recognition of the Union." Tr. 23:22-24:2 (Grossman); *see* JXs 37 & 38; Tr. 86:12-23 (Cramer). These activities were those which Hyatt had to right to perform under the HMAs. *See* JXs 35 & 36, §§ 3.1-3.2. There was no intervening entity which temporarily took over Hyatt's management rights before Relevant assumed them. Therefore, Relevant is certainly Hyatt's successor within the meaning of Paragraph 15 of the MOA.Hyatt argues that Relevant was not its successor because "[t]here were no Hyatt bargaining unit position employees working at either hotel at the time Hyatt was terminated[,] …neither hotel was even open at the time of the

terminations of both [HMAs,]" and because "Relevant… managed both hotels from Day 1 of their openings[.]" Tr. 18:18-19:11 (Grossman). But it is irrelevant that no bargaining unit employees were yet hired at the Hotels. The ordinary definition of a successor in interest does not depend on whether there yet existed an employment relationship with employees.

For clarity's sake, Local 11 notes that in raising this argument, Hyatt appears to have misapplied a doctrine regarding successor liability that is entirely inapplicable here. Namely, where a union has already been certified as the collective bargaining agent of employees, and the employer sells all or part of the business, the union may sue to compel the buyer to bargain or to enforce the CBA *against the successor employer* with whom the union has no privity. This doctrine applies whether or not the CBA contained a successor clause. *See Martin Podany* Associates, 80 LA 658, 6690 (Gallagher, 1983) (explaining that the " ['substantial continuity'] test is applied independent of the contract provisions relating to successors[,]" that "[i]t derives from the federal labor law and not from the contract[,]" and "applies even when the contract of sale expressly provides that the purchaser will not assume the labor agreement").

In that context, arbitrators, the NLRB, and courts evaluate several factors to determine whether there is "'substantial continuity of identity in the business enterprise' before and after a change of ownership" to determine whether the successor employer should be bound by the predecessor employer's CBA. *Howard Johnson Co. v. Detroit Loc. Joint Exec. Bd., Hotel & Rest. Emp. & Bartenders Int'l Union, AFL-CIO*, 417 U.S. 249, 263 (1974); *see, e.g., High Point Sprinkler Co.*, 67 LA 239 (Connolly, 1976); *Sexton's Steak House, Inc.*, 76 LA 576 (Ross, 1981) These factors include: "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the

same products, and basically has the same body of customers." *Fall River Dyeing & Finishing Corp. v. N.L.R.B.*, 482 U.S. 27, 43 (1987).

The issue in front of the Arbitrator is not whether Relevant is Hyatt's successor under this Board-made doctrine, as Local 11 is not suing Relevant; instead, the legal issue is whether Relevant is a successor within the meaning of Paragraph 15 of the MOA such that Hyatt had a duty to obtain an assumption of the agreement from Relevant. Thus, Hyatt's argument that Relevant is not a successor because there were no bargaining unit employees working at the Hotels before the transfer or because Relevant managed the hotels from "day one" misapplies a successor doctrine which is inapplicable here. Thus, Relevant is certainly Hyatt's successor in interest for the purposes of the MOA.

**B. Hyatt's Efforts to Obtain an Assumption of the MOA from Relevant during the Negotiation of the HMA Amendments Do Not Excuse Hyatt from Liability**

Hyatt may argue that its nonperformance of its contractual obligations should be excused because it made efforts to obtain an assumption of the Agreement during the negotiation of the amendments to the HMAs. Yet any attempts which Hyatt undertook to get Relevant to honor the MOA are immaterial to the question of liability. Successorship clauses "impos[e] a duty on [the employer] to succeed in obligating its successor, not simply a duty to try[.]" *Wheelabrator*, 88 F.3d at 45. Thus, the Arbitrator should find that Hyatt's failure to perform under the contract was inexcusable.

**C. Because Hyatt has Proffered Shifting Justifications as to Why it Did Not Attempt to Obtain an Assumption of the MOA from Relevant during the Negotiation of the Termination and Franchise Agreements, the Arbitrator Should Disregard Any Argument that the Plain Language Shields Hyatt from Liability**

Hyatt will argue that the plain language of the MOA obviously excuses it from obtaining an assumption of the MOA due to the nature of the transaction here, that is, a termination of its

management rights and the execution of a franchise deal. However, the Arbitrator should disregard any such attempts to bend the plain language of the MOA. Hyatt's shifting justifications for why it did not obtain an assumption of the MOA during the negotiation of the Termination Agreements and the Franchise Agreements demonstrate that its argument based on the plain language is simply a last-ditch effort to avoid liability.

When Hyatt's Vice President of Lifestyle Development and Owner Relations, Ms. Cramer, was asked on direct and on cross why Hyatt did not attempt to assign the MOA during negotiations over the Termination and the Franchise Agreements, Ms. Cramer twice testified that she did not know. Tr. 56:4-9, 84:20-25, 108:10-13 (Cramer). Notably, Ms. Cramer *never* testified that Hyatt genuinely and conclusively believed it had no legal obligation to obtain an assumption of the MOA at the time that Hyatt and Relevant negotiated the Franchise deal, as Hyatt does today.

In contrast, Hyatt's Vice President of Labor Relations for the Americas, Mr. D'Angelo first claimed that that the reason Hyatt did not include provisions related to the MOA as a condition of the deal was because its rights were terminated, so it had nothing to transfer. Tr. 167: 4-168:5, 216:15-20 (D'Angelo). Then, Mr. D'Angelo testified that Hyatt failed to obtain an assumption of the MOA because it would have been "inappropriate" to include such an assumption in a franchise agreement, and/or violate anti-trust law, as well as would raise a "whole host of [other] complicated issues[.]" *Id.*; Tr. 216:21-217:1. Neither Ms. Cramer nor Mr. Angelo explained what the "whole host of complicated issues" were which prevented Hyatt from binding Relevant.

Thus, Mr. D'Angelo's testimony did not match Ms. Cramer's, nor did it completely overlap the justification provided by Hyatt in its opening statements, in which anti-trust law was not mentioned. Even taking for granted Mr. D'Angelo's line of argument that it would be a violation of anti-trust law to include provisions related to the MOA in the Franchise Agreements, Mr.

D'Angelo did not explain why anti-trust law precluded Hyatt from obtaining an assumption of the MOA outside of the Franchise Agreements.

The internal inconsistencies *within* Ms. Cramer's and Mr. D'Angelo's testimony, respectively, the discrepancies *between* Ms. Cramer and Mr. D'Angelo's testimony, and the divergence between their testimony and Hyatt's justification for its abandonment of its contractual obligations today reveals that Hyatt may never even have had a genuine legal justification for why it refused to obtain an assumption of the MOA from Relevant – raising the inference that Hyatt's arguments originating from the plain language are simply a hollow effort to evade liability. Otherwise, one would assume that Hyatt's VPs, Ms. Cramer and Mr. D'Angelo, would have parroted the same message. One would also assume that had Hyatt had a genuine legal justification for reneging on the MOA, it would have explained this legal justification to Local 11 in a detailed letter. Yet Hyatt never even provided Local 11 notice in writing that it would no longer be managing the Hotels. Tr. 49:10-50:5 (Petersen). For all of these reasons, the Arbitrator should reject Hyatt's argument for non-liability.

**D. Failure to Find a Breach of Hyatt's Successorship Obligations Would Encourage Employers and Developers in Los Angeles to Engage in Evasive Anti-Union Tactics of the Nature Here**

The Parties agree that the execution of the Termination and Franchise agreements were a strategic attempt on Relevant's part to circumvent the MOA. Tr. 199:20-25 (D'Angelo). While Hyatt may not have spearheaded the effort to cut the Union out, it certainly acquiesced in it. From a policy standpoint, the Arbitrator's failure to find a breach of contract here would further encourage such evasive tactics by employers and would set a dangerous precedent for future employers and developers in Los Angeles with similar buyer's and developer's remorse over

previously guaranteed labor protections. Thus, the Arbitrator should find that Hyatt's conduct here constituted a breach of the MOA.

## VI. REMEDY

### A. The Arbitrator Should Order Hyatt to Obtain an Assumption of the MOA from Relevant Because Paragraph 13 of the MOA Expressly Authorizes the Arbitrator to Order the Non-compliant Party to Comply with the MOA

In *Marley-Wylain Co.,* Arbitrator Jacobowski recognized:

> There is a basic integrity and spirit of honor given to a labor agreement[.] This concept of integrity [] gives impetus to recognizing a responsibility of the company to assure the continuance of the contract under a transfer to a successor.

88 LA at 984. Moreover, "[i]t is … settled that an arbitrator, in the exercise of his power, may include injunctive-type relief in the award." Marvin F. Hill & Anthony V. Sinicropi, *Remedies in Arbitration* at 309 (2d. ed. 1991) ("*Remedies in Arbitration*"). In fact, Hill & Sinicropi state that "the discussion as to the authority of an arbitrator to issue an injunction is 'foolish' because that is all that an arbitrator ever does or should do." *Remedies in Arbitration* at 326.

While it is thus clear that an arbitrator inherently possesses the authority to issue specific performance, here, the MOA goes even further. That is, the MOA expressly grants the authority to order specific performance. Paragraph 13 categorically states that "[t]he arbitrator shall have the authority to order the non-compliant party to comply with this Agreement." JX 1, ¶ 13.

"Unless otherwise stated, when the parties execute a labor agreement, they intend that the employer will perform in accordance with the contract, not the option of performing or paying damages." *Id*. Because Hyatt failed to obtain an assumption of the MOA from Relevant as a condition of the Franchise Agreements, the Termination Agreements, or otherwise, Arbitrator should order Hyatt, the non-compliant party, to comply with the MOA.

Hyatt argues that the Arbitrator should not grant specific performance because any balancing of equities weighs in Hyatt's favor. But the Arbitrator's authority to order the non-compliant party to comply with the agreement is not conditioned on the balancing of any equities. Instead, his authority to order the non-compliant party to comply with the Agreement is triggered by the simple fact of one party's non-compliance the MOA.

In fact, to condition the Arbitrator's power to order Hyatt to comply with the remedy on a balancing of equities would impermissibly "alter, amend, add to, subtract from or otherwise modify or change the terms and conditions of [the MOA.]" JX 1, ¶ 13. *See Kobelco Stewart Boiling Co.*, 1997 LA Supp. 103580 (Talarico, 1997) (rejecting union's argument that arbitrator must engage in a balancing of equities before denying subcontracting grievance; where CBA contained an express provision allowing subcontracting in the agreement, the "arbitrator lack[ed] discretion to alter the effect of that provision by performing his own 'balancing test'"); *Transamerica Delaval, Inc.*, 85 LA 321, 325 (Bridgewater, 1985) (refusing to engage in a balancing of equities in resolution of grievance "because of the parties mutually agreed to constraints on [the arbitrator's] authority" which expressly prohibits the arbitrator from adding to the scope and terms of the contract). Thus, the Arbitrator should order Hyatt to comply with the MOA regardless of the present equities.

**B. Hyatt and Relevant's Ongoing Franchise Relationship at the tommie and Thompson Hotels Negates Any Argument that Specific Performance is Impossible**

Hyatt argues that the Arbitrator should not order specific performance because it is impossible for Hyatt to comply with the MOA. Hyatt also argues that without recission or reformation of the Termination or Franchise Agreements, it would be impossible for Hyatt to obtain an assumption of the MOA from Relevant. Tr. 23:12-21 (Grossman).

Hyatt's arguments cannot stand upon the slightest of scrutiny into the present factual scenario. Given the ongoing and close business relationship between Hyatt and Relevant at the tommie and the Thompson established by virtue of the Franchise Agreements, it is certainly possible for Hyatt to comply with the MOA. Both Hyatt and Relevant desire a continued, smooth operation of the Hotels. Relevant has a significant interest in maintaining *the tommie* and *the Thompson* branding of the Hotels, which Hyatt owns. Utilizing its position as franchisor and brand owner, Hyatt could certainly exert pressure on Relevant to assume the MOA.

Moreover, taking together Relevant's history of financial distress in conjunction with Hyatt's doubts as to Relevant's ability to successfully operate the Hotels, an opportunity may soon arise for Hyatt to invest additional money into the Hotels' operations – as it did when Relevant asked Hyatt for money in the development stage of the projects. This time around, Hyatt can condition its grant of financial investment on Relevant's assumption of the MOA. None of this would necessarily require recission or reformation of the Termination Agreements or the Franchise Agreements.

Hyatt may deny that any of the above facts give Hyatt any leverage over Relevant. But *Summit,* discussed earlier in Part V.A.3. of this brief, renders this argument unconvincing. *Summit Associates, Inc.*, 1997 LA Supp. 101889 (Fullmer, 1997). *Summit* concerned whether employer Summit's act in deeding over two hotels to Dollar Bank in lieu of foreclosure, without requiring Dollar Bank to assume the CBA, was a violation of the successor clause. As a defense, the employer claimed "it had no leverage to obtain the inclusion of such a term." Arbitrator Fullmer rejected Summit's argument, reasoning that the Dollar Bank had two options: to obtain ownership of the properties "through foreclosure or, *with the cooperation of* Summit, through a deed in lieu of foreclosure." *Id.* Dollar Bank and Summit "were able" in fact "to agree to transfer the properties

through the deed in lieu of foreclosure[,]" as evidenced by a seven page agreement between the parties. From these facts, the Arbitrator found the employer's argument against liability untenable, reasoning:

> Certainly as a matter of form Summit would appear to have been entitled to propose as one of the terms of that agreement that Dollar assume the Union's collective bargaining agreement. … **[T]he implicit threat to force Dollar to go through formal foreclosure proceedings if it did not accept the assumption of the Union's agreement would appear to have provided Summit with at least some leverage[] in that Dollar as well as Summit would face delay and higher costs through those proceedings.**

*Id.* (bolded emphasis added). In dicta, Arbitrator Fullmer also commented that:

> In any event this "deed in lieu of foreclosure" situation is not vastly different in this respect from any standard commercial transfer in which the purchaser has the better of the bargaining positions. No one would argue in that situation that the seller is excused from [compliance with the successorship clause] because it had a poor bargaining position.

*Id.* at fn. 12.

Arbitrator Fullmer's opinion confirms that a party to a commercial contract, like Hyatt, can utilize creative forms of leverage such as threatening formal legal proceedings, causing delays and imposing higher costs to get the other party to "cooperate" on its terms. Given Hyatt and Relevant's ongoing contractual relationships, Hyatt can certainly conjure some form of leverage akin to that which Arbitrator Fullmer referenced in *Summit* to obtain an assumption of the MOA from Relevant here. Thus, the Arbitrator should find that it is not impossible for Hyatt to comply with the MOA.

Hyatt may further argue that it is impossible to comply with the agreement because it is impossible for Hyatt to do *exactly* what it promised in the MOA. That is, Paragraph 15 requires that the Employer "obtain from its successor or successors in interest a written assumption of this Agreement" "*as a condition to* any such sale, assignment, or transfer[.]" JX 1, ¶ 15 (emphasis added). As the argument would go, because Hyatt already transferred its management interest, it

is impossible for Hyatt to condition the transfer on Relevant's assumption of the MOA. The Arbitrator should similarly disregard this argument. The Restatement (Second) of Contracts states,

> An order of specific performance or an injunction will be so drawn as best to effectuate the purposes for which the contract was made and on such terms as justice requires. It need not be absolute in form and **the performance that it requires need not be identical with that due under the contract.**

§ 358(1) (1981) (bolded emphasis added); *see also* 25 Williston on Contracts § 67:1 (4th ed.) (stating that "[i]n general, the remedy of specific performance enables a court to compel a party to a contract to perform, if not exactly, *at least substantially*, what it has undertaken to do"). For this reason, even though Hyatt's compliance with the MOA will require Hyatt to obtain an assumption of the MOA after the franchise deal was already signed, the Arbitrator can still require Hyatt to comply with the MOA by obtaining an assumption of the MOA from Relevant now.

In summary, because Hyatt can still exert its influence over Relevant given the parties' ongoing relationship at the Hotels, any argument that it is impossible for Hyatt to comply with an order of specific performance is meritless.

### C. Any Balancing of Equities Favors Local 11

#### 1. The Standard for Specific Performance

Even if the Arbitrator finds that he must engage in a balancing of equities before undertaking to issue an order of specific performance, the Union certainly prevails. Williston on Contracts explains:

> Specific performance, like all equitable remedies, strives to do perfect justice. It will be granted when it is apparent from a view of all the circumstances of the particular case that it will serve the ends of justice. Furthermore, specific performance of an agreement may be an appropriate remedy where enforcement of the promise is necessary to avoid injustice.
>
> Assuming, then, that a valid contract exists and has been broken, the general rule defining the instances where specific performance will be granted may be stated as follows: where damages are an inadequate remedy and the nature of the contract is

> such that specific enforcement of it will not be impossible or involve too great practical difficulties, such as long, drawn out and extensive supervision, equity will grant a decree of specific performance.

25 § 67:1 (4th ed.) (footnotes removed).

**2. The Arbitrator Should Award Specific Performance Because Hyatt Covertly Participated in Relevant's Collusive Effort Yet Reaped Financial Benefit from It**

Mr. D'Angelo testified that from the time that Relevant and Hyatt agreed to amend the HMAs, through the negotiation of the Termination and Franchise Agreements, "[his] personal belief" was that "[Relevant] w[as] looking for a way to circumvent the agreement that Richard entered into with Kurt." Tr. 199:20-25 (D'Angelo). Ms. Cramer further testified that Relevant told Hyatt that it pulled the plug on the HMA amendments because "as a result of the union agreement, … [Relevant's] proposed partner would not finance and fund the projects unless we entered into a franchise agreement. Tr. 78:12-18 (Cramer). Thus, Hyatt knew that Relevant's creative restructuring of the original management deal was for two chief, interrelated purposes: to avoid complying with the MOA, and to increase profits.

Yet Hyatt kept the Union in the dark regarding this backdoor deal which centrally concerned the Union's rights under the MOA for over a year. Hyatt should not be rewarded for its participation in Relevant's strategic anti-union efforts.

Moreover, while Hyatt no longer serves as operator of the Hotels, it continues to reap financial benefit from the Hotels as franchisor. The continued operation of the Hotels also benefits *the tommie* and *the Thompson* brands, which Hyatt owns, compounding the profits to Hyatt. Moreover, Relevant will pay back the key money which invested in the Thompson over the life of the agreement. Tr. 110:19-111:16 (Cramer). Thus, Hyatt stands to significantly benefit from the continued operation of the Hotels.

While the tommie and the Thompson are just another set of lucrative "lifestyle" or "trophy assets" to Hyatt, to workers, the Hotels comprise their workplace and livelihood. Certainly, Hyatt reaps financial benefit, and brand benefit, whether or not the MOA is followed. The continued operation of the Hotels' is in both the employees' and the employers' best interests – yet without the MOA, only the employees are harmed. Thus, the equities here demand an order of specific performance.

**3. The Arbitrator Should Award Specific Performance Because Monetary Damages Are an Inadequate Substitute for an Employer's Promise to Protect Organizing Rights**

Damages are certainly an insufficient substitute for an order of specific performance here. The Restatement (Second) of Contracts states,

> "Adequacy is to some extent relative, and the modern approach is to compare remedies to determine which is more effective in serving the ends of justice. Such a comparison will often lead to the granting of equitable relief. **Doubts should be resolved in favor of the granting of specific performance or injunction."**

§ 359 (1981).

Local 11 signed the MOA to ensure that employees at the tommie and the Thompson would exercise their free choice to join a union under Section 7 of the National Labor Relations Act. Without this agreement, these low-wage hotel workers have become vulnerable to the pressures of anti-union campaigns which often involve malicious tactics by management. The specter of misconduct is even higher given that Relevant is now responsible for determining the working conditions, hours, and benefits of employees at the tommie and the Thompson. Relevant is a company which has recently gained notoriety in various press outlets for its repeated failures to pay its contractors on time in its development projects. *See* EX 40. Even Hyatt has expressed worries about Relevant's status as employer, citing Relevant's lack of experience managing hotels of this caliber and its lack of infrastructure. Tr. 81:2-10, 103:23-104:14 (Cramer). Ms. Cramer

went so far as to deem Relevant "unqualified[.]" Tr. 81:2-10 (Cramer). Thus, only an order of specific performance will serve the ends of justice here.

Arbitral precedent further supports the notion that only specific performance will result in justice for the Union. *See Sexton's Steak House, Inc.*, 76 LA 576 (Ross, 1981). In *Sexton's*, discussed earlier at Part V.A.4 of this brief, at issue was whether the buyer of a restaurant business formerly operated by Employer D'Onofrio was bound by the CBA which had been in effect at the restaurant with the Restaurant Workers Union. *Id.* at 577. The CBA contained a successorship clause with language similar to the successorship clause here. *Id.* Without any notice to the union, D'Onofrio opened an escrow to sell nearly all the business' assets to Buyer, who took possession of the place of business during the escrow period and offered jobs to any former employee willing to continue working. *Id.* Before coming to arbitration, the union won an injunction in San Diego Superior Court enjoining the sale of the business wherein the court ordered the parties to arbitrate the issue both as to liability and remedy. *Id.*

After Arbitrator Ross found that Buyer's assumption of the business triggered the operation of the successorship clause, he reasoned that *only* an order of specific performance – specifically, an order for D'Onofrio to comply with the CBA as a condition of sale to Buyer – would provide the union adequate relief from the Employer's breach of contract. *Id.* at 578-79. Moreover, he found that "[t]he benefits intended to be protected and threatened could only be partially returned by a monetary award, and since damages would continue for the life of the agreement, the amount of damages to which these employees would be entitled would be speculative." *Id.* at 579.

The arbitrator thus enjoined the seller "from continuing with the sale unless and until [the seller] require[d] and obtain[ed], as a condition of the sale, compliance with [the successorship clause] of the labor agreement, that is, [the seller] must first obtain the purchaser's agreement to

be bound by the present collective bargaining agreement." *Id.* As in *Sexton's*, only an order of specific performance will provide the Union relief from Hyatt's breach of contract. In addition, as in *Sexton's,* any amount of damages owed to the Union would be speculative. Thus, the Arbitrator should order specific performance.

**4. Hyatt Acted in Bad Faith when it Neglected to Withhold Franchise Rights or Use Other Sources of Leverage to Compel Relevant to Assume the MOA during the Negotiation of the Termination and Franchise Agreements**

Hyatt argues that the equities weigh in its favor because Hyatt acted reasonably when it acquiesced in Relevant's franchise plans. Hyatt cites the fact that Relevant threatened Hyatt both with legal action and termination of the HMAs in support of this argument. Tr. 24:3-13 (Grossman). Hyatt may further argue that an order of specific performance is inequitable because Hyatt made good faith efforts to try to get Relevant to assume the MOA during its negotiations with Relevant over amendments to the HMAs – and Hyatt genuinely believed it was never required to obtain an assumption of the MOA as a condition to the Termination and Franchise Agreement. These arguments must fail.

Hyatt failed to act with the requisite integrity due a labor agreement here because Hyatt utterly failed to use several sources of leverage at its disposal to obtain an assumption of the MOA from Relevant. *See* 1997 LA Supp. 101889. In fact, on March 26, 2021, Hyatt wrote to Relevant that if Relevant wanted "to find a transactional path forward, … [Hyatt] will … reach[] out to [Relevant] again shortly to discuss *the parameters under which Hyatt would consider entering into franchise agreements for these hotels*." EX 34 (emphasis added). Hyatt's insistence on specific "parameters" demonstrates that Hyatt indeed had bargaining power. None of those parameters was honoring the MOA.

The Termination and Franchise Agreements were executed just two days before the Thompson opened. At that time, and in the months prior, Relevant certainly had a strong interest in landing the franchise deal; Relevant had just expended significant time and resources into signing the HMAs and in negotiations regarding amendments to the HMAs. Moreover, Relevant was in dire financial straits. To start over again with another operator, with the Hotels' opening date so near, would have been costly to Relevant. If Hyatt dropped out of the deal, Relevant would lose the wealth of experience – and brand power – that Hyatt possessed.

All of these circumstances demonstrate that Hyatt possessed immense leverage. Hyatt could have withheld its signature on the Termination Agreements and Franchise Agreements to obtain an assumption of the MOA from Relevant. Of course, Hyatt elected not to use this leverage, because it was more interested in protecting its trophy assets than abiding by its contractual obligations. *See* Tr. 68:7-15, 69:16-19, 102:18-103:7 (Cramer).

Hyatt could have also threatened to enforce its rights under the HMAs. At the time that Hyatt and Relevant signed the Termination Agreements and Franchise Agreements, Relevant had no right to terminate the HMAs unless there was a sale of the Hotels or other extenuating circumstances such as Hyatt's default or condemnation of the Hotels. Tr. 95:17-25 (Cramer); *see* JXs 2 & 3, §§ 10.1-10.3. Relevant's unfettered right to terminate the HMAs would only arise after the first five years of operation. *Id.* Hyatt's refusal to let Relevant break the HMA terms of termination was another untapped source of influence. Its refusal to utilize these sources of leverage is akin to the employer's refusal to use threats of legal action, delays, or financial pressure during negotiations over a mutually beneficial business deal in *Summit.*

The existence and use of Hyatt's leverage for other purposes is further evidenced by the favorable terms which it achieved in the Termination and Franchise Agreements. For instance, the

Termination Agreements required that "as a condition precedent to the termination of the Management Agreement contemplated in [the] Termination Agreement," Relevant would pay Hyatt "all amounts due to Hyatt in accordance with the Management Agreement[.]" JXs 35 & 36, ¶ B.2(a). Under the Franchise Agreements, Hyatt also has final approval which entity shall operate the Hotels. JXs 37 & 38, Art. IV, § 4.2. Hyatt must even approve Relevant before it can assume the position of hotel operator. JXs 37 & 38, Art. IV, § 4.2(a) (stating that "Franchisee may not itself manage the Hotel without Hyatt's approval of Franchisee as the Hotel's operator"). Under the Franchise Agreements, Hyatt also sets out detailed standards for franchisee performance. Hyatt has provided no legitimate reason for why it could not have included a provision requiring assumption of the MOA in either of these agreements, or otherwise.

Hyatt even concedes that it did not even *attempt* to get Relevant to assume the MOA while negotiating the Franchise and Termination Agreements, further evidencing Hyatt's bad faith.

Hyatt will argue it did not try to get Relevant to assume the MOA at the franchise deal stage because Hyatt genuinely believed that the termination of its management rights would erase its responsibility under the MOA. Yet Hyatt's excuse that it did not try to obtain an assumption of the MOA from Relevant because Hyatt believed it had no contractual obligation to do so are incredulous. Ms. Cramer and Mr. D'Angelo's testimony as to why and whether Hyatt believed it had no obligation to assume the MOAs were inconsistent. Ms. Cramer first testified that she did not know why Hyatt did not attempt to have Relevant assume the MOA as a part of the Termination Agreements or the Franchise Agreements. Tr. 84:7-25 (Cramer). Then, Mr. D'Angelo testified that Hyatt failed to make such attempts because "it's something that would not be included in the termination agreement … and its something that's not appropriate for a franchise agreement[;] [i]n fact, it might be illegal and a violation of antitrust law[.]" Tr. 216:13-217:1 (D'Angelo). Certainly,

had Hyatt decided not to honor one of its contracts, it would have had an internal legal team give Hyatt's businesspeople a cogent explanation as why the successorship language did not apply in this specific kind of instance. The witnesses' failure to recount this explanation raises the inference that Hyatt's failure to even try to obtain an assumption of the MOA at that stage was <u>not</u> based on a genuine legal assessment – but instead based on preserving its own financial interests.

Finally, any argument that Relevant's litigation threats constituted real pressure on Hyatt is disingenuous given that Hyatt strongly and consistently believed that it had the right to enter the MOA per its authority under the HMAs. *See* Tr. 66:8-13, 83:8-21, 97:17-21 (Cramer); Tr. 196:3-17 (D'Angelo); EX 31. Thus, any threats of legal action could not have produced real anxiety, as Hyatt would have been certain of its triumph in court, or more likely, called Relevant out on its bluff before litigation ever began. For these reasons, Hyatt acted in bad faith, and the equities favor the Union.

**5. The Union Acted Logically by Signing the MOA with the Employer Instead of the Developer Following Three Months of Good Faith Negotiations**

**i. Hyatt Has Not Shown that the Union Possessed or Used CEQA Litigation to which the Union is not a Party as Leverage**

Hyatt argues that the Union has "unclean hands" because it failed to use CEQA litigation which was impeding construction at the tommie as leverage to secure an owner's letter containing card check/neutrality provisions directly from Relevant. Tr. 121:8-23 (Grossman & Petersen); *see* EXs 15 & 19. Had the Union used this leverage to get Relevant to sign an owner's letter, Hyatt argues, it would have obviated the need for Hyatt to compel Relevant to assume the MOA, and thus would have obviated the need for this arbitration. Tr. 115:22-116:5, 129:18-130:4 (Grossman). Hyatt claims that the Union instead used this leverage to obtain terms of a different

agreement – namely, those contained in the MOA – from Relevant. In Hyatt's view, this makes the Union a bad actor.

This argument fails. Hyatt has not shown that the Union did or could have used the CEQA litigation as leverage. The Union was not a party to the CEQA litigation. Environmental impact litigation is a normal part of the Union's work as the Union cares immensely about its members' well-being at the workplace, in their homes, and the community. It is not an organizing tool. Tr. 159:16-160:7, 162:25-163:4 (Petersen). Hyatt also produced no one involved in that litigation who could testify as to the reasons behind the stipulated concrete pour and dismissal in that litigation. *See* EXs 15 & 19. Thus, Hyatt has not shown that the Union could have used the litigation to obtain an owner's letter from Relevant.

Hyatt's claim that the Union used the CEQA litigation "as a cudgel" to obtain specific card check/neutrality terms from Relevant is unsubstantiated. Tr. 130:2-4 (Grossman). Though Mr. D'Angelo initially testified to the existence of a quid pro quo, cross-examination quickly revealed that Mr. D'Angelo's beliefs were based on conjecture. Tr. 212:15-19 (D'Angelo) (answering "no," when asked by Union counsel whether Mr. D'Angelo "know[s] for a fact that the Union had conditioned withdrawal of … the CEQA litigation[] on agreeing to CCNA").[16] Moreover, Mr. Petersen testified that the Union never attempted to use the litigation as leverage in negotiations over the MOA with Relevant. Tr. 160:8-161:14 (Petersen). He also testified that Relevant never asked the Union to drop the CEQA litigation in exchange for anything. Tr. 163:12:15 (Petersen). Hyatt has not produced Mr. Heyman nor anyone else from Relevant to testify in this arbitration.

[16] Mr. D'Angelo also testified that Mr. Heyman told Mr. D'Angelo that *Relevant's* intent was to use the card check/neutrality agreement as leverage to get a favorable outcome in the CEQA litigation. Tr. 222:16-21 (D'Angelo). But there is no evidence in the record which shows that Mr. Heyman shared his state of mind with the Union.

Thus, Hyatt has not shown that Union used the CEQA litigation as leverage to obtain any kind of deal from Relevant.

**ii. Because Executing an MOA Directly with an Employer is the Best Way to Protect the Union's Interests, it Would Have Been Foolish for the Union to Execute an Owner's Letter with Relevant**

Hyatt's argument that an owner's letter would have better protected the Union's interests is patently false. The Union signed the MOA directly with the Hotel's employer. This is the "golden standard" for card check/neutrality agreements. Tr. 44:12-20 (Petersen). A union only resorts to signing a check/neutrality agreement with a hotel developer if that developer has not yet selected an employer to operate the hotel. *See* Tr. 147:22-148:25 (Petersen). Moreover, even if the Union succeeded in obtaining an owner's letter from Relevant, this would have done nothing more to protect the Union's interest, as the Union's interest is sufficiently protected by the current MOA, as demonstrated in Part V of this brief. Finally, the Union could neither have predicted that the successor operator of the tommie and the Thompson would be Relevant – nor that Hyatt and Relevant would engage in collusive efforts to avoid the MOA. Local 11 was not aware of the fracas between Relevant and Hyatt over whether Heyman authorized Hyatt to sign the MOA; to Local 11's knowledge, Relevant had negotiated and explicitly authorized the MOA. What's more, even if the Union had signed an owner's letter with Relevant, history shows Relevant would have attempted to weasel out of such a letter in the same manner that Relevant and Hyatt colluded here. Thus, Hyatt's argument that the Union's interests would have been better protected had the Union signed an owner's letter with Relevant are farfetched and misplaced.

**iii. Even if an Owner's Letter Would Have Obviated the Need for Hyatt to Obtain an Assumption of the MOA from Relevant, Unlike Hyatt, the Union Was Not Obligated to Protect Hyatt's Interests**

Hyatt's argument that the Union could have entered other contracts that would have obviated Hyatt's need to obtain an assumption of the MOA from Relevant, which in turn would have obviated the need for this arbitration, does not render the Union's hands unclean. First, if Hyatt did not like the terms of the deal, Hyatt simply could have refused to enter the MOA. Hyatt was not strong-armed into signing the MOA. The Union is not at fault for Hyatt's volitional acts.

Second, unlike Hyatt, the Union had no contractual obligation to execute any deal with Relevant or to make deals in Hyatt's interest.

Third, Hyatt's argument is weak as the Union's execution of an owner's letter with Relevant was not the only course of conduct which would have prevented this arbitration. Had Hyatt in fact obtained an assumption of the MOA from Relevant, there also would be no need for this arbitration.

**iv. Hyatt, Relevant, and the Union Acted in Concert to Achieve the MOA, Belying Hyatt's Claim that the Union was "Wheeling and Dealing Behind Hyatt's Back"**

Finally, Hyatt argues the Union acted in bad faith because it was "wheeling and dealing behind Hyatt's back." Tr. 22:7-12 (Grossman). Yet nothing about the circumstances of the deal suggests unfairness or bad faith. The Union achieved this deal over three months of sincere negotiation with Hyatt and Relevant. Tr. 31:1-35:12, 147:8-17 (Petersen); Tr. 167:24-168:4 (D'Angelo). As far as the Union knew, Hyatt was aware of the Union's ongoing negotiations with Relevant. The Union reached out to Hyatt to assess its comfortability with the proposed terms. Tr. 34:16-39:9 (Petersen); JX 13. In fact, Mr. D'Angelo recalled that he produced the initial draft of what came to be the MOA. Tr. 187:14-17 (D'Angelo). Mr. D'Angelo also confirmed to the Union that Hyatt agreed with the proposed terms before the Union signed the Agreement. Tr. 39:16-41:14 (Petersen). JX 14, p. 52-54. The day after the MOA was signed, Mr. D'Angelo further stated in

writing that the MOA reflected "the agreement and understanding *we all* had with Local 11[,]" "we all" clearly referring to Hyatt and Relevant. *See* EX 17 (emphasis added). Thus, the Arbitrator should disregard Hyatt's claim that the Union has come into arbitration with unclean hands and find that the equities weigh in favor of the Union.

**6. Hyatt will Suffer No Harm from an Order of Specific Performance Because Relevant is Legally Obligated to Indemnify Hyatt for Costs Associated with this Arbitration and the Hotels are Now Profitable**

An order of specific performance is equitable here because it will result in no major harm to Hyatt. This is because Termination Agreements each contain an indemnification provision, wherein Relevant has agreed to indemnify Hyatt for "any purported rights asserted by any labor organization related to the hotel." JXs 35 & 36, ¶ B.6.(c). Certainly, Relevant will thus indemnify Hyatt for any costs associated with this arbitration.

Moreover, in contrast to Relevant's prior precarious financing issues related to the tommie and the Thompson, the Hotels are now open. Tr. 98:14-22 (Cramer). Relevant thus secured all the financing necessary to operate the Hotels. For this reason, even if compliance with the MOA causes Hyatt or Relevant to incur some financial cost, at this juncture, any such costs will be offset by the profitability of the Hotels.

Finally, should the Arbitrator fail to enforce the successorship clause, employees at the tommie and Thompson will become vulnerable to the whims of rookie employer Relevant, which already has a proven record of disdain for workers' Section 7 rights. By contrast, the only so-called harm that would be done to Hyatt in the event the Arbitrator orders Hyatt to comply with the Agreement would be a strained business relationship with Relevant – though this seems a foregone conclusion anyhow. Thus, Hyatt's claim that specific performance will result in significant harm to Hyatt are untenable.

### 7. The Union Did Not Delay in Bringing this Arbitration Against Hyatt

Hyatt's defense of laches is unfounded. Williston on Contracts states:

> Laches will bar a claim of specific performance where the omission to assert a right for an unreasonable and unexplained length of time has been *prejudicial* to an adverse party, such that it would be inequitable to enforce the right.

25 § 67:21 (4th ed.)

First, the Union did not delay in bringing this arbitration. The Union initiated this arbitration in August 2021, the very same month that the Thompson opened for business. This was also well before the December 2021 opening of the tommie. It was only in July of 2021 that Andrew Shayne, CFO, categorically informed the Union that it would not honor the MOA. Tr. 52:7-15 (Petersen). Certainly, the Union's request to arbitrate the issue the very next month after Relevant refused to honor the MOA is not an instance of delay.

Moreover, any arguable delay was reasonable given that individuals at Relevant gave the Union inconsistent answers as to whether Relevant would honor the MOA throughout June and July of 2021. Tr. 51:16-51:15 (Petersen). Thus, the Union had no clear understanding regarding Relevant's intentions regarding the MOA. The Union was not privy to the terms of the Franchise or the Termination Agreements until this arbitration, further obfuscating the Union's understanding of where its rights under the MOA stood at that time. Tr. 50:14-51:15 (Petersen). It was only just before this arbitration that the Union even had access to the documents which effectuated the change in operators at the Hotels. *Id.*

Second, Hyatt has not pointed to any prejudice suffered from the Union's so-called delay in bringing this arbitration. In fact, Hyatt's own failure to inform the Union of Relevant's attempts to circumvent the MOA likely contributed to any arguable delay, rendering Hyatt's defense of laches doubtful. *See* Tr. 69:7-23 (Cramer); 199:8-25-200:14 (D'Angelo). Moreover, had Hyatt

made the Union aware of Relevant's intent to circumvent the MOA sooner, the Union might have been able to intervene to protect its interests earlier, thereby eliminating the need for this arbitration in the first place.

### D. California Civil Code Section 3390, Subdivision (d) Is Inapplicable

#### 1. Because Paragraph 13 Prohibits the Arbitrator from Adding to, Subtracting from, or Otherwise Modifying the MOA, and the MOA is Silent as to the Incorporation of State Law, the Arbitrator's Application of State Law Would Exceed His Authority

An arbitrator's authority to fashion a remedy is not inherently limited by state law governing remedies. The Supreme Court has stated that "[an arbitrator's] award is legitimate only so long as it draws its essence from the collective bargaining agreement[.]" *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). But "[t]he [Supreme] Court has not decided whether an award made in contravention of positive law is within the 'essence' harbor." *How Arbitration Works* at 2.2.A.Ii.b.(2) (stating that) (internal citations and quotations removed).

In fact, where a contract is silent on the applicability of external law, arbitrators choose to disregard state law, even at the parties' insistence on its relevance. *See, e.g., 201097-AAA,* 2017 LA Supp. 201097 (Bodah, 2017) (rejecting union's argument that arbitrator should rely on external law and instead finding that arbitrator should "confine his decision-making to the wording of the Agreement… and look [to external law] only when absolutely necessary" to the resolution of the grievance); *Grower-Shipper Vegetable Assn.,* 70 LA 350 (Ross, 1978) (stating that "[i]n the absence of the mutual agreement of the parties authorizing a determination of the effect of the external law, [arbitrators] must be confined only to exercising the authority created by the contract and to the restricted issue agreed upon by the parties, which is limited only to determining

the parties' intent under their agreement and to determine whether or not the bargain struck was violated").

Hyatt argues that the Arbitrator cannot award the Union specific performance because to do so would run afoul of California Civil Code section 3390, subdivision (d), which states:

> The following obligations cannot be specifically enforced:
> …
> (d) An agreement to procure the act or consent of the spouse of the contracting party, or of any other third person.

Yet here, nothing in the four corners of the MOA here suggests that the Parties intended to incorporate state law into the agreement. *Cf. George Day Const. Co. v. United Bhd. of Carpenters & Joiners of Am., Loc. 354*, 722 F.2d 1471, 1479 (9th Cir. 1984) (rejecting employer's argument that the court should vacate arbitral award because of arbitrator's reliance on external law; because clause in CBA explicitly required arbitrator's decision to be consistent with federal and state law, arbitrator's conclusion that he had "authority to look to external law for guidance in interpreting and applying the agreement" was entitled to deference); *San Jose Unified School District*, 1995 LA Supp. 114304 (Bogue, 1995) (finding that arbitrator was required to assure that "any remedy ordered" complied with external law where contract *explicitly provided* that "[n]othing [contract] shall be construed ... to empower the arbitrator to render any decision or make an adjustment which is contrary to law"); *Glasgow School District No. 11A*, 92 LA 287, 288-89 (Corbett, 1988) (explaining that "[contract] language *requiring* the Employer to take *'all necessary actions* to comply with the letter and the spirit of state and federal laws,' resulted in the incorporation of the state law … into the collective bargaining agreement") (emphasis added); *see generally Dunlop Tire Corp.*, 94 LA 365, 368 (Kindig, 1990) (recognizing that "an arbitrator does not have the authority to interpret federal or state laws[;] …[t]he Arbitrator's authority is limited to an interpretation and application of the language of the Agreement").

In fact, to inject state law into the Agreement would require the Arbitrator to go beyond his authority. Here, the MOA expressly grants the Arbitrator broad authority to enforce the MOA, namely, to order the non-compliant party to comply with the MOA. JX 1, ¶ 13. Nonetheless, Paragraph 13 of the MOA also provides that:

> The arbitrator shall have no authority to alter, amend, add to, subtract from or otherwise modify or change the terms and conditions of this Agreement or engage in interest arbitration.

JX 1, ¶ 13. Other labor arbitrators have found themselves precluded from considering state law where the agreement expressly prohibits the arbitrator from adding, subtracting, altering, or amending the agreement. *See, e.g.*, *Transamerica Delaval, Inc.*, 85 LA 321, 322-25 (Bridgewater, 1985) (refusing to consider otherwise relevant provision in the California Labor Code because the parties agreed that "the arbitrator's decision shall … not add to, subtract from, alter or amend the scope and terms of this Agreement"). Should the Arbitrator read California Civil Code section 3390, subdivision (d) into the MOA, he would impermissibly subtract from his express authority to order the non-compliant party to comply with the Agreement.

Moreover, while the MOA is silent as to the applicability of state law, it is not silent as to the applicability of other laws, namely, Section 7 of the NLRA. Paragraph 13 provides, in part:

> In applying the terms of this Agreement, the arbitrator's interpretation of matters of law shall be consistent with the rights guaranteed to employees under Section 7 of the National Labor Relations Act.

JX 1, ¶ 13. The inclusion of this language indicates that the Parties know how to contract for the applicability of specific external laws. Had the Parties intended the Arbitrator's interpretative and/or remedial authority to be limited by state law, they would have expressly included this limit on his authority in Paragraph 13 or elsewhere in the MOA. Thus, the Arbitrator's remedial authority is not limited by Civil Code section 3390, subdivision (d).

**2. Even if the Arbitrator's Authority was Limited by State Law, Local 11 Has Found no Court Precedent or Arbitral Caselaw Which Supports the Application of Section 3390(d) to this Case**

The Union could not find even a single reported case in which a court or labor arbitrator refused to enforce any agreement based on California Civil Code section 3390, subdivision (d). Given the complete dearth of caselaw applying this subsection, along with the fact that this subsection has existed (with slight but immaterial variation) since 1872, the Arbitrator should not find that the subdivision imposes any limit on his authority to order the non-compliant party to comply with the agreement. *See 201097-AAA*, 2017 LA Supp. 201097 (Bodah, 2017) (finding "no assistance in external law" to the resolution of the grievance where "none of the court case [sic] cited by the Union contain a fact pattern similar enough to the case at hand"); *see generally Northrop Corp. v. Triad Int'l Mktg. S.A.*, 811 F.2d 1265, 1269–70 (9th Cir. 1987), *amended*, 842 F.2d 1154 (9th Cir. 1988) (finding that where "[n]o California case clearly contrary to the arbitrators' interpretation has been called to [the court's] attention[,]" the court would be hard-pressed to find that the arbitrator "misread" California law).

Moreover, Williston on Contracts recognizes a similar rule to the one announced by the California statute, which states:

> [E]quity will not decree the performance of an act which requires the assent of a third person, where it does not appear that the third person will give the required assent. Stated otherwise, specific performance will be denied where performance of the promise *would necessarily require conduct by a third party over whom the promisor has no right of control*.

25 Williston on Contracts § 67:13 (4th ed.) (footnotes removed) (emphasis added). While Williston's more expositive statement of the same rule is only persuasive authority, it lends insight into the intended scope of California's version of the rule, especially in the absence of applicable caselaw. Williston's statement of the rule recognizes that an agreement to procure the act or

consent of a third person is only unenforceable where a defendant has *no control* over the third person's performance, and where the defendant has demonstrated that that the third person *will not give* the required assent. *Id.*

Hyatt has not demonstrated that Relevant would not give the required assent. Instead, the record reveals that Hyatt entirely failed to pursue its obligation to obtain an assumption of the MOA during the negotiation of the Franchise and Termination Agreements. Thus, Hyatt has not shown that Relevant would not agree to assume the MOA, especially given the changed circumstances.

Moreover, Hyatt has not demonstrated that Relevant is a third party over whom Hyatt has no right of control. To the contrary, Hyatt and Relevant are close business partners in a franchise relationship at the Hotels. Under the Franchise Agreements, Hyatt possesses a great deal of control over Relevant. Section 4.2 (a) of the Franchise Agreements states that "Franchisee may not itself manage the Hotel without Hyatt's approval of Franchisee as the Hotel's operator[.]" JXs 37 & 38. Certainly, this language alone grants Hyatt a significant right of control over Relevant in its capacity as operator of the Hotels. For this reason, California Civil Code section 3390, subdivision (d) does not apply to this case.

**3. Relevant is Not a Third Party to the Contract in Any Usual Sense**

Even if the Arbitrator finds state law applicable, California Civil Code section 3390, subdivision (d) is inapplicable because Relevant is not a third party to the MOA in any ordinary sense. Relevant negotiated the agreement and instructed Hyatt to sign the agreement. Tr. 31:1-32:10, 147:8-17 (Petersen). In Mr. D'Angelo's own words, the MOA memorialized "the agreement that [Mr. Heyman of Relevant] entered into with [Mr. Petersen.]" Tr. 199:22-25 (D'Angelo). Hyatt signed the deal on Relevant's terms. Tr. 196:10-17 (D'Angelo). Given the

dearth of caselaw applying the statute, Local 11 has no reason to believe that it was intended to apply where the putative third party in fact: negotiated the terms of the contract at issue, instructed one of the parties to contract to enter the contract on certain terms, and then engaged in strategic attempts to circumvent that agreement. Thus, California Civil Code section 3390, subdivision (d) does not affect the Arbitrator's remedial authority. Thus, the Arbitrator should order Hyatt to comply with the MOA.

**E. Alternatively, the Arbitrator Should Award Local 11 Monetary Damages**

Should the Arbitrator deny the Union's request for specific performance, alternatively, the Arbitrator should award the Union contract damages for the amount of dues which the Union would have received from employees of the Hotels, had Hyatt not breached the MOA. *See generally Summit Associates, Inc.*, 1997 LA Supp. 101889 (Fullmer, 1997) (ordering employer which failed to get successor-operator of two hotel businesses to assume CBA in violation of the successorship provision to pay union "[a]n amount equal to the Union dues lost by the Union" over a period of two years, beginning the day that businesses were unlawfully transferred).

//

//

//

//

//

//

//

//

//

## VII. CONCLUSION

For the foregoing reasons, the Arbitrator should find that Hyatt breached the MOA when it transferred its management rights in the tommie and the Thompson to Relevant without requiring Relevant to assume the MOA as a condition of the transfer. As a remedy for this breach, the Arbitrator should order Hyatt to comply with the MOA by obtaining an assumption of the MOA from Relevant.

Dated: March 11, 2022

Respectfully submitted,
**GILBERT & SACKMAN**
**A LAW CORPORATION**

By______________________
Joshua F. Young
*Attorneys for the Union*

**GILBERT & SACKMAN**
**A LAW CORPORATION**

By______________________
Nicole Grinstein
*Attorneys for the Union*